HMS V. LAYALE

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-98-118-CV

HMS AVIATION AND APPELLANT

LAYALE ENTERPRISES, S.A. AND APPELLEE

V.

LAYALE ENTERPRISES, S.A. AND APPELLEE

HMS AVIATION AND APPELLANT

------------

FROM THE 67TH DISTRICT COURT OF TARRANT COUNTY

------------

OPINION

------------

The trial court denied the special appearance of HMS Aviation (“HMS”).  Both HMS and Layale Enterprises, S.A. (“Layale”) appeal from portions of the trial court’s ruling on HMS’s special appearance.  In this interlocutory appeal, HMS appeals the trial court’s ruling that it has in rem jurisdiction over the property that is the subject of this suit.  Layale appeals the trial court’s ruling that it does not have in personam jurisdiction over HMS.
(footnote: 1)  We hold the trial court did not have in personam or in rem jurisdiction in this case.  We reverse the trial court’s judgment and render judgment dismissing the case.

Background

Layale filed this suit against HMS seeking to recover title and possession to a Boeing 727 airplane (“the Airplane”)
(footnote: 2) and damages alleged to have been sustained by Layale as a result of HMS’s alleged conversion of the Airplane. Layale, a Panamanian corporation, claimed that it purchased the Airplane in 1987 from the Sultan of Brunei and registered the Airplane in the Cayman Islands, British West Indies.  Layale contends the Airplane disappeared from an airport in Amman, Jordan and that HMS secreted the Airplane from Layale from 1992 to 1997 when Layale discovered its whereabouts in Fort Worth, Texas.

HMS is a sole proprietorship unincorporated business operating under the laws of Jordan with offices in London, England and Amman, Jordan.  HMS asserts that in February 1996, it took possession of the Airplane in Amman, Jordan pursuant to a lease agreement whereby HRH Prince Talal Bin Mohammed and HRH Princess Ghida Talal of the Hashemite Kingdom of Jordan leased the Airplane to HMS.  

While the Airplane was in HMS’s possession, HMS took the Airplane to a repair and refurbishing facility in San Antonio, Texas, and at a later date to a repair facility at Meacham Field in Fort Worth, Texas.  On April 10, 1997, while the Airplane was located at Meacham Field, Layale filed this suit alleging HMS had converted the Airplane that belonged to Layale, seeking damages for conversion and a declaratory judgment that Layale was the owner of the Airplane and was entitled to possession.  The trial court granted Layale a writ of sequestration, and the Airplane remains in Fort Worth.

HMS filed a special appearance contending that the trial court did not have jurisdiction over HMS or the Airplane.  The trial court held a hearing on the special appearance plea.  On April 9, 1998, the court found HMS had not entered a general appearance; the court had no personal jurisdiction over HMS; but the court had in rem jurisdiction over the Airplane.  Accordingly, the court denied HMS’s special appearance plea.  No findings of fact were requested or filed.  

Both parties appealed the trial court’s order, and the case was set for oral argument in this court for September 2, 1998.  On August 25, 1998, the parties notified this court that the case had been removed to federal court.  Accordingly, on August 28, 1998 this court issued an order removing the case from the court’s docket and stating that for administrative purposes this case was “abated and will be treated as a closed case.”  The order further stated that the cause “may be reinstated on prompt motion by any party showing that the cause has been remanded to state court and specifying what further action, if any, is required from this court.”

On February 17, 2004, HMS filed a motion to reinstate this appeal.  At this court’s request, on March 8, 2004 HMS filed a copy of the order from the United States District Court remanding the case to state court.  This federal court order is dated February 4, 1999.  Prior to February 17, 2004, neither of the parties involved in this appeal had previously notified this court that the case had been remanded to state court, and this court was unaware of the federal court’s action.  Further, the parties have not proffered any explanation regarding the reason for the five-year delay in notifying this court that the federal court had remanded the case to state court.
(footnote: 3)  

On March 12, 2004, this court reinstated this appeal and notified the parties that because this is a permissible interlocutory appeal from a special appearance, this appeal is accelerated.  
See
 
Tex. Civ. Prac. & Rem. Code Ann.
 § 51.014(a)(7) (Vernon Supp. 2004-05); 
Tex. R. App. P.
 28.  The case was submitted to the court with oral argument on April 6, 2004.            

Waiver Of Special Appearance
 

Layale initially asserts that HMS has waived its right to challenge the denial of its special appearance plea.  This same argument was raised in the trial court, which ruled against Layale on this issue by finding that HMS had not entered a general appearance.  The basis for Layale’s contention is that after HMS filed its special appearance, and before the trial court denied the special appearance, HMS filed a motion to increase the sequestration bond.  The motion was not heard or ruled upon until after the trial court denied HMS’s special appearance.  Layale contends that the filing of HMS’s motion is inconsistent with its special appearance and constitutes a general appearance.

A party enters a general appearance whenever it invokes the judgment of the court on any question other than the court's jurisdiction; if a defendant's act recognizes that an action is properly pending or seeks affirmative action from the court, that is a general appearance.  
Dawson-Austin v. Austin
, 968 S.W.2d 319, 322 (Tex. 1998), 
cert. denied
, 525 U.S. 1067 (1999).  However, Rule 120a provides a vehicle by which a defendant may file a pleading in addition to the special appearance.  
Tex. R. Civ. P.
 120a.  In pertinent part, this rule provides: 

1. . . . Such special appearance shall be made by sworn motion filed prior to motion to transfer venue or any other plea, pleading or motion; 
provided however, that
 a motion to transfer venue and 
any other plea, pleading or motion may be
 contained in the same instrument or 
filed subsequent thereto without waiver of such special appearance
; and may be amended to cure defects.  The issuance of process for witnesses, the taking of depositions, the serving of requests for admissions, and the use of discovery processes, shall not constitute a waiver of such special appearance.  Every appearance, prior to judgment, not in compliance with this rule is a general appearance. 

2. 
Any motion to challenge the jurisdiction provided for herein shall be heard and determined before a motion to transfer venue or any other plea or pleading may be heard.
  

. . . .

4. . . . If the objection to jurisdiction is overruled, the objecting party may thereafter appear generally for any purpose.  
Any such special appearance
 or such general appearance 
shall not be deemed a waiver of the objection to jurisdiction when the objecting party or subject matter is not amenable to process
 issued by the courts of this State.

Id
. (emphasis added).  The words "not amenable to process" in Rule 120a(4) mean that the special appearance is available solely to establish that the court cannot, under the federal and state constitutions and the appropriate state statutes, validly obtain jurisdiction over the person or the property of the defendant with regard to the cause of action pled.  
GFTA Trendanalysen B.G.A. Herrdum GMBH & Co., K.G. v. Varme
, 991 S.W.2d 785, 786 (Tex. 1999).  

Rule 120a makes matters in the same instrument and subsequent matters subject to the special appearance without an express statement to that effect for each matter.  
Dawson-Austin
, 968 S.W.2d at 322.  The first sentence of HMS’s motion to increase the sequestration bond recites that it is “subject to and without waiving its previously filed Special Appearance pursuant to 
Tex. R. Civ. P. 
120a.”  Nonetheless, Layale contends this constitutes a general appearance, citing 
St. Louis & S.F.R. Co. v. Hale
, 109 Tex. 251, 206 S.W. 75 (1918).  
St. Louis
 was decided well before the enactment of Rule 120a in 1962.
(footnote: 4)  As noted in the General Commentary to Rule 120a, prior to the adoption of Rule 120a, a special appearance was unknown to Texas practice, and the filing by a defendant of any defensive pleading, though only to challenge the court’s jurisdiction, constituted an appearance and submission to the jurisdiction of the forum.  
General Commentary—1966
, 
Tex. R. Civ. P. Ann
. 120a (Vernon 2003); 
Atchison, T. & S.F. Ry. Co. v. Stevens
, 109 Tex. 262, 206 S.W. 921, 921-22 (1918).  Accordingly, because 
St. Louis
 was decided at a time when Texas did not permit a defendant to challenge the trial court’s jurisdiction by filing a special appearance, we do not find it applicable to the instant case.  

Layale also relies upon 
Fridl v. Cook,
 908 S.W.2d 507, 515 (Tex. App.—El Paso 1995, writ dism’d w.o.j.).  In that case, the defendant claimed the trial court erred in refusing to quash discovery requests against the defendant because it had never been named as an independent defendant nor had it been served with citation.  
Id.
  The appellate court held that the defendant waived its complaint by making a general appearance in the case when it filed a motion to compel arbitration.  
Id.
  A Rule 120a special appearance was not involved in 
Fridl
; therefore, we do not find it applicable to the situation before us. 

HMS’s motion seeking to increase the sequestration bond was filed “subject to” its pending special appearance, and the hearing and ruling on the special appearance took place prior to the hearing and ruling on the motion to increase the sequestration bond.
(footnote: 5)  In an analogous situation, a defendant’s special appearance was held not to have been waived by the subsequent filing of a motion to dissolve a writ of garnishment, or the notice of the hearing on the motion, because the motion was not heard prior to the ruling on the special appearance.  
Minucci v. Sogevalor, S.A.
, 14 S.W.3d 790, 799-800 (Tex. App.—Houston [1st Dist.] 2000, no pet.); 
see also
 
Exito Electronics Co. v. Trejo
, 47 Tex. Sup. Ct. J. 738, 740, 2004 WL 1434798, at *2 (Tex. June 25, 2004) (holding subsequent special appearance not waived by defendant’s prior filing of Rule 11 agreement extending time to file an initial responsive pleading, even though Rule 11 agreement was not expressly made subject to the special appearance);
 
Dawson-Austin
, 968 S.W.2d at 323-24 
(holding that filing of motion for continuance did not waive movant’s special appearance because relief requested in motion was not inconsistent with assertion that trial court lacked jurisdiction; motion requested trial court defer ruling on all matters then pending before the court, including the special appearance).  

Because HMS’s motion to increase the sequestration bond was made subject to its special appearance and the motion was not heard prior to the special appearance being heard or determined, we hold the trial court did not err in ruling that HMS did not waive its special appearance plea and that HMS had not made a general appearance by filing its motion to increase the sequestration bond.
(footnote: 6) 

Special Appearance

The Due Process Clause of the Fourteenth Amendment limits the power of a state court to render a valid personal judgment against a nonresident defendant.  
World-Wide Volkswagen Corp. v. Woodson
, 444 U.S. 286, 291, 100 S. Ct. 559, 564 (1980).  Due process requires that the defendant be given adequate notice of the suit and be subject to the personal jurisdiction of the court.  
Id.
  The Due Process Clause, by ensuring the orderly administration of the laws, “gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.”  
Id.
 at 297, 100 S. Ct. at 567. 

Whether a court has personal jurisdiction over a defendant is a question 

of law. 
 Am. Type Culture Collection, Inc. v. Coleman
, 83 S.W.3d 801, 805-06 (Tex. 2002), 
cert. denied
, 537 U.S. 1191 (2003); 
BMC Software Belgium, N.V. v. Marchand
, 83 S.W.3d 789, 794 (Tex. 2002).  But in resolving this question of law, a trial court must frequently resolve questions of fact. 
Coleman
, 83 S.W.3d at 806; 
BMC
, 83 S.W.3d at 794.  On appeal, the trial court's determination to grant or deny a special appearance is subject to de novo review, but appellate courts may be called upon to review the trial court's resolution of a factual dispute.  
Coleman
, 83 S.W.3d at 806; 
BMC
, 83 S.W.3d at 794.  When the trial court does not issue findings of fact, reviewing courts should presume that the trial court resolved all factual disputes in favor of its judgment.  
Coleman
, 83 S.W.3d at 806; 
BMC
, 83 S.W.3d at 795.  However, when the appellate record includes the reporter’s and clerk’s records, these implied findings are not conclusive and may be challenged on appeal for legal and factual sufficiency.  
BMC
, 83 S.W.3d at 795.

In Personam Jurisdiction
 

Layale challenges the trial court’s ruling that it did not have in personam jurisdiction over HMS.  The Texas long-arm statute governs Texas courts’ exercise of jurisdiction over nonresident defendants.  
See
 
Tex. Civ. Prac. & Rem. Code Ann.
 § 17.041-.044 (Vernon 1997), § 17.045 (Vernon Supp. 2004-05).  That statute permits Texas courts to exercise jurisdiction over a non-resident defendant that “does business” in Texas, and the statute lists some activities that constitute “doing business.”  
Id
. § 17.042.  The list of activities, however, is not exclusive.  
BMC
, 83 S.W.3d at 795.  Section 17.042's broad language extends Texas courts’ personal jurisdiction “as far as the federal constitutional requirements of due process will permit.”  
Id.
 (quoting 
U-Anchor Adver., Inc. v. Burt
, 553 S.W.2d 760, 762 (Tex. 1977), 
cert. denied
, 434 U.S. 1063 (1978)).  Thus, the Texas Supreme Court has instructed courts to rely upon precedent from the United States Supreme Court and other federal courts, as well as our own state’s decisions, in determining whether a nonresident defendant has met its burden to negate all bases of jurisdiction.  
Id.

Personal jurisdiction over nonresident defendants is constitutional when two conditions are met:  (1) the defendant has established minimum contacts with the forum state; and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice.  
Id.
; 
see Int’l Shoe Co. v. Washington
, 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945).  

Minimum contacts

The purpose of the minimum contacts analysis is to protect the defendant from being haled into court when its relationship with Texas is too attenuated to support jurisdiction.  
Coleman
, 83 S.W.3d at 806; 
Schlobohm v. Schapiro
, 784 S.W.2d 355, 357 (Tex. 1990).  Thus, the Supreme Court has stated that

where the defendant “deliberately” has engaged in significant activities within a State, or has created “continuing obligations” between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by “the benefits and protections” of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

Burger King Corp. v. Rudzewicz
, 471 U.S. 462, 475-76, 105 S. Ct. 2174, 2184 (1985) (citations omitted).

Although not determinative, foreseeability is an important consideration in deciding whether the nonresident defendant has purposefully established minimum contacts with the forum state.  
BMC
, 83 S.W.3d at 795; 
Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.
, 815 S.W.2d 223, 226-27 (Tex. 1991).  However, a defendant should not be subject to a foreign court’s jurisdiction based upon random, fortuitous, or attenuated contacts, or the unilateral activity of another party.  
Burger King
, 471 U.S. at 475, 105 S. Ct. at 2183; 
Guardian
, 815 S.W.2d at 226.  It is the quality and nature of the defendant’s contacts, rather than their number, that is important to the minimum contacts analysis.  
Coleman
, 83 S.W.3d at 806; 
Guardian
, 815 S.W.2d at 230 n.11.  Because of the unique and onerous burden placed on a party called upon to defend a suit in a foreign legal system, the minimum contacts analysis is particularity important when the defendant is from a different country.  
CSR Ltd. v. Link
, 925 S.W.2d 591, 595 (Tex. 1996) (orig. proceeding) (citing 
Asahi Metal Indus. Co. v. Superior Court of California
, 480 U.S. 102, 107 S. Ct. 1026 (1987)).  

The Supreme Court has held that the concept of minimum contacts can be seen to perform two related, but distinguishable, functions.  
See World-Wide, 
444 U.S. at 291-92, 100 S. Ct. at 564.  It protects the defendant against the burdens of litigating in a distant or inconvenient forum, and it acts to ensure that the states through their courts do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system.  
Id.
 at 292, 100 S. Ct. at 564.  The protection against inconvenient litigation is typically described in terms of “reasonableness” or “fairness.”  
Id.  

A nonresident defendant’s minimum contacts with a forum can give rise to either general jurisdiction or specific jurisdiction.  
Helicopteros Nacionales de Colombia, S.A. v. Hall
, 466 U.S. 408, 414 nn.8-9, 104 S. Ct. 1868, 1872 nn.8-9 (1984); 
BMC
, 83 S.W.3d at 795-96; 
CSR
, 925 S.W.2d at 595.  Specific jurisdiction is established if the defendant’s alleged liability arises from or is related to an activity conducted within the forum.  
Helicopteros, 
466 U.S. at 414 n.8, 104 S. Ct. at n.8; 
BMC
, 83 S.W.3d at 796.  In contrast, general jurisdiction is present when a defendant’s contacts in a forum are continuous and systematic so that the forum may exercise personal jurisdiction over the defendant even if the cause of action did not arise from or relate to activities conducted within the forum state.  
Helicopteros, 
466 U.S. at 414 n.9, 104 S. Ct. at n.9; 
BMC
, 83 S.W.3d at 796; 
Schlobohm
, 784 S.W.2d at 357.  When general jurisdiction is asserted, the minimum contacts analysis is more demanding than when specific jurisdiction is asserted and requires a showing of substantial activities in the forum state.  
Guardian
, 815 S.W.2d at 228; 
Schlobohm
, 784 S.W.2d at 357.  

Analysis

HMS’s alleged liability to Layale does not arise from and is not related to an activity that HMS conducted in Texas.  Therefore, we are not concerned with specific jurisdiction.  Layale asserts general jurisdiction was shown in this case due to HMS’s continuous and systematic contacts with Texas.  The plaintiff bears the initial burden of pleading sufficient allegations to bring a nonresident defendant within the provisions of the long-arm statute.  
Coleman
, 83 S.W.3d at 807; 
McKanna v. Edgar
, 388 S.W.2d 927, 930 (Tex. 1965).  But upon filing a special appearance, the nonresident defendant assumes the burden to negate all the bases of personal jurisdiction alleged by the plaintiff.  
Coleman
, 83 S.W.3d at 807; 
Kawasaki Steel Corp. v. Middleton
, 699 S.W.2d 199, 203 (Tex. 1985). General jurisdiction is premised on the notion of consent.  
Coleman
, 83 S.W.3d at 808.  That is, by invoking the benefits and protections of a forum’s laws, a nonresident defendant consents to being sued there.  
Id.
  When a nonresident defendant purposefully structures transactions to avoid the benefits and protections of a forum’s laws, the legal fiction of consent no longer applies.  
Id.
  For general jurisdictional purposes, we do not view each contact in isolation.  
Id
. at 809.  All contacts must be carefully investigated, compiled, sorted, and analyzed for proof of a pattern of continuing and systematic activity.  
Id.
; 
Schlobohm
, 784 S.W.2d at 359. 

Because Layale alleges that general jurisdiction exists, we examine whether HMS met its burden of establishing that its contacts with Texas were not continuous and systematic.  HMS is a sole proprietorship unincorporated business operating under the laws of Jordan with offices in London, England and Amman, Jordan.  The owner, Hany Mohammed Salaam, is a citizen of Lebanon and resides in London and Beirut, Lebanon.  Salaam has never lived in, maintained a residence in, or been a citizen of Texas.  By affidavit, Salaam testified that neither HMS nor Salaam individually has ever done business in Texas, had any business office or owned any real or personal property in Texas, had any bank accounts in Texas, had any telephone listings or mailing addresses in Texas, been issued a certificate of authority to conduct affairs in Texas, or had a registered agent for service of process in Texas.

Salaam designated Salem Bayazid to be President of HMS; Bayazid is a citizen of Egypt and resides in Paris, France.  In March 1996, Bayazid accompanied one of HMS’s airplanes (HS-1, which is not the Airplane in dispute in this lawsuit) to San Antonio, Texas for installation of avionic devices on HS-1. The service provider was S.I.P. Technical Services, Inc. (S.I.P.).  The original contract between HMS and S.I.P. was signed by Bayazid in Beirut, and Bayazid signed additional contracts when he arrived in San Antonio.  It is a customary requirement in the industry that at least one representative must accompany an airplane when it is being refurbished.  Bayazid was in San Antonio for approximately fifteen to twenty days while the work was being performed.

Bayazid returned to Texas in 1996 from mid-May to mid-June when he accompanied the Airplane in dispute in this lawsuit to San Antonio to have work performed by S.I.P.  Bayazid testified that he did not recall if he signed this new contract with S.I.P. while he was in Beruit or San Antonio.  He remained in San Antonio with the Airplane for fifteen to twenty days.  During each of his visits to San Antonio, Bayazid stayed in a hotel and sat in the S.I.P. conference room; he did not have an office in San Antonio and did not at any time attempt to sell any services or goods in Texas.  Bayazid acknowledged on cross-examination that there was an economic benefit to HMS to bringing HS-1 and the Airplane to San Antonio because this procedure cost much less than flying S.I.P.’s entire crew outside the country to perform the work wherever the airplanes were currently located.

In December 1996, Bayazid brought the Airplane to Meacham Field in Fort Worth, Texas, so that International Aviation Services, Ltd. (IAS) could perform repair and refurbishing work on the Airplane.  Several people accompanied Bayazid on the Airplane.  Two flight attendants cleaned the airplane and stayed approximately two days, and the pilot and co-pilot stayed a week to discuss the repairs with IAS.  While Bayazid was in Fort Worth waiting for the repairs to be completed on the Airplane, he stayed at a hotel and occupied whatever space IAS offered to him.  This space included a telephone to which he had access, and IAS provided Bayazid with a cell phone for his use during his stay.  IAS moved Bayazid from one space to another when they needed the room.
(footnote: 7)  Bayazid testified he never paid for the use of any office space at IAS’s facility or for the use of the office telephone or the cell phone, and the contract price for the work did not include charges for office space or telephone usage.

The repair contract with IAS was signed by Bayazid, as President of HMS, on December 6, 1996 and states it is entered into between IAS and HRH Prince Talal Bin Mohammed.  The Airplane was initially brought to Fort Worth so that IAS could install an auxiliary fuel tank system, and the scope of the work expanded to include a complete paint job on the Airplane and interior upgrades and modifications.  On March 19, 1997, HMS and IAS entered into another repair contract for the Airplane; Bayazid signed the contract on behalf of HMS.  Both of the contracts with IAS were signed by Bayazid in Fort Worth.

Both the December 6, 1996 contract and the March 19, 1997 contract specify that any claim or controversy arising out of the contracts shall be submitted to arbitration to be conducted in Tarrant County, Texas, that the applicable substantive law governing the arbitration and the interpretation of the contracts shall be done under the law of the State of Texas, and that “judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.”
(footnote: 8)
 IAS’s President, Walter Nubel, testified by deposition that when IAS is working on an airplane, the company’s policy is that a representative of the customer must be easily available to review, discuss, and approve the work.  It is customary in the industry to require a representative to be present and to provide an office for this purpose.  As part of the bidding process, the charge for this office and the cost of lights and phones, along with labor costs, is the facility’s overhead that is built into the price of the bid.

Layale has alleged that it is the true owner of the Airplane and that HMS converted the Airplane, last seen by Layale in Amman, Jordan.  Therefore, Layale’s cause of action does not arise from any activities of HMS that occurred with any person or entity located in Texas.  Accordingly, we must determine if HMS’s contacts with Texas were so continuous and systematic that Texas may exercise personal jurisdiction over HMS even if the cause of action did not arise from or relate to activities conducted within Texas.  

Although HMS brought two of its airplanes to Texas for repairs and refurbishing on three occasions, neither HMS, its owner, or its President ever maintained a residence or office of any sort in Texas, nor did they own any property within Texas.  HMS established that it is customary in the aviation repair business to require a representative of the owner to be present onsite to resolve any problems that arise during the repair process.  During these trips to Texas, HMS personnel did not transact any business in Texas; their presence was required by the vendors and the only business they transacted related to the repair and refurbishing of HS-1 or the Airplane.  

Mere purchases from the forum state, standing alone, even if occurring at regular intervals, are not enough to warrant a state’s assertion of in personam jurisdiction over a nonresident in a cause of action not related to those purchases.  
Helicopteros
, 466 U.S. at 417-18, 104 S. Ct. at 1874; 
see Garner v. Furmanite Australia Pty., Ltd.
, 966 S.W.2d 798, 803 (Tex. App.—Houston [1st Dist.] 1998, pet. denied).  Additionally, even when purchases in the forum state are combined with the nonresident sending personnel into the forum state for training purposes, this is insufficient to establish in personam jurisdiction.  
See
 
Helicopteros
, 466 U.S. at 418, 104 S. Ct. at 1874.

Layale argues that in personam jurisdiction has attached because HMS invoked the benefits and protections of the laws of the State of Texas in the contracts that HMS signed with S.I.P. and IAS.  Layale contends that HMS should have reasonably anticipated being called into a Texas court because it signed contracts with these two Texas vendors, and two of the contracts contain forum-selection clauses.  
The initial contract with S.I.P. was signed by Bayazid in Beruit, and the additional contracts were signed by him either in Beruit or in San Antonio, when he was accompanying the plane to the vendor’s place of business.  The two contracts with IAS were signed in Texas and provide that they shall be interpreted under the laws of the State of Texas, and any arbitration shall be conducted in Tarrant County, Texas.

Foreseeability alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause.  
World-Wide,
 444 U.S. at 295, 100 S. Ct. at 566.  The foreseeability that is critical to a due process analysis is not the mere likelihood that a product will find its way into the forum state.
  See id.
 at 297, 100 S. Ct. at 567.  Rather, it is that the defendant's conduct and connection with the forum state are such that the defendant should reasonably anticipate being haled into court there.  
Id.
; 
see Kulko v. Superior Court of California
, 436 U.S. 84, 97-98, 98 S. Ct. 1690, 1699-1700 (1978).  

The forum-selection clauses for purposes of arbitration were in the contracts that HMS entered into with parties that are not involved in this suit.  While HMS should have reasonably anticipated that it could be called into a Texas court to respond to a lawsuit involving these two contracts with third parties, these contracts are totally unrelated to the causes of action alleged by Layale in the instant lawsuit and do not affect in any way the allegations made by Layale against HMS.  We find the case of 
Project Engineering USA Corp. v. Gator Hawk, Inc.
, relied upon by Layale, to be distinguishable on its facts.  833 S.W.2d 716 (Tex. App.—Houston [1st Dist.] 1992, no writ).  Gator Hawk sued a nonresident California defendant in Texas.  
Id.
 at 719.  The evidence at the special appearance hearing established that the nonresident defendant served as a distributor in California for three separate Texas companies, none of whom were parties to the underlying lawsuit.  The contract with one of these Texas companies contained a forum-selection clause providing Texas as the proper forum for any litigation between those parties.  
Id.
 at 720.  In considering all the evidence from the hearing, the appellate court held that the nonresident defendant had minimum contacts in Texas because it could reasonably be inferred that in furtherance of its representation efforts in California for the three Texas companies, the nonresident defendant “necessarily had to keep in regular communication with the Texas companies it represented.”  
Id.
 at 722.  We find these facts establish noticeably stronger ties to Texas than those presented to the trial court in the instant case, which did not involve any continued employment contracts agreed to by HMS to do business in Texas.  Rather, HMS entered into several repair and refurbishing contracts, two of which had a forum-selection clause for purposes of arbitration, but unlike the nonresident defendant in 
Gator Hawk
, HMS never agreed to act as a distributor or employee of a Texas company.   

Upon review of all the evidence presented to the trial court, we conclude that HMS’s contacts with the State of Texas were not so continuous and systematic as to invoke in personam jurisdiction over HMS.  We hold that HMS met its burden of establishing that in personam jurisdiction was not proven because HMS did not have sufficient minimum contacts with the State of Texas.  Accordingly, when the trial court ruled upon HMS’s special appearance, the court did not err in determining that it lacked in personam jurisdiction over HMS.  

In Rem Jurisdiction

HMS challenges the trial court’s ruling that it had in rem jurisdiction over the Airplane.  A judgment in rem affects the interests of all persons in designated property.  
Shaffer
, 433 U.S. at 199 n.17, 97 S. Ct. at 2577 n.17.  A judgment quasi in rem affects the interests of particular persons in designated property.  
Id.
  A judgment quasi in rem can be of two types:  in Type One, the plaintiff is seeking to secure a pre-existing claim in the subject property and to extinguish or establish the nonexistence of similar interests of particular persons; i
n Type Two, the plaintiff seeks to apply what he concedes to be the property of the defendant to the satisfaction of a claim against him.  
Id.
  The instant case involves Type One quasi in rem jurisdiction inasmuch as Layale sought to secure a pre-existing claim in the Airplane and to extinguish or establish the nonexistence of similar interests of HMS.  
See id.
    

In 
Pennoyer v. Neff
, the United States Supreme Court held that a state court could exercise jurisdiction over property within the state’s borders and determine the rights and interests of nonresidents.  95 U.S. 714 (1877) (available at 1877 WL 18188).  But in 
Shaffer
, the court abandoned this position and concluded instead that jurisdiction over property, like jurisdiction over persons, must be based on minimum, purposeful contacts and must not offend traditional notions of fair play and substantial justice.  433 U.S. at 212, 97 S. Ct. at 2584; 
see Dawson-Austin
, 968 S.W.2d at 327.  After extensively reviewing the history of the requirements for in rem jurisdiction, the 
Shaffer
 court concluded that:

The fiction that an assertion of jurisdiction over property is anything but an assertion of jurisdiction over the owner of the property supports an ancient form without substantial modern justification.  Its continued acceptance would serve only to allow state-court jurisdiction that is fundamentally unfair to the defendant.

We therefore conclude that all assertions of state-court jurisdiction must be evaluated according to the standards set forth in International Shoe and its progeny.  

433 U.S. at 212, 97 S. Ct. at 2584; 
Int’l Shoe,
 326 U.S. 310, 66 S. Ct. 154.  The Court subsequently interpreted 
Shaffer
 as determining that: 

quasi in rem
 jurisdiction, that fictional “ancient form,” and 
in personam
 jurisdiction, are really one and the same and must be treated alike -- leading to the conclusion that 
quasi in rem
 jurisdiction, 
i.e.
, that form of 
in personam
 jurisdiction based upon a “property ownership” contact and by definition unaccompanied by personal, in-state service, must satisfy the litigation-relatedness requirement of 
International Shoe
. 

Burnham v. Superior Court of California
, 495 U.S. 604, 621, 110 S. Ct. 2105, 2116 (1990).

International Shoe
 holds that the defendant's contacts with the forum state must be such that maintenance of the suit "does not offend traditional notions of fair play and substantial justice.”  
World-Wide
, 444 U.S. at 292, 100 S. Ct. at 564; 
Int’l Shoe Co.,
 326 U.S. at 316, 66 S. Ct. at 158. The relationship between the defendant and the forum must be such that it is reasonable “to require the defendant to defend the particular suit which is brought there.” 
 World-Wide
, 444 U.S. at 292, 100 S. Ct. at 564; 
Int’l Shoe Co.,
 326 U.S. at 316-17, 66 S. Ct. at 158.  Implicit in this emphasis on reasonableness is the understanding that the burden on the defendant, while always a primary concern, will in an appropriate case be considered in light of other relevant factors.  
World-Wide
, 444 U.S. at 292, 100 S. Ct. at 564.  Other factors to consider in determining whether jurisdiction in the forum state comports with traditional notions of fair play and substantial justice include the  the interests of the forum state in adjudicating the dispute, the plaintiff’s interest in obtaining convenient and effective relief, the interstate judicial system’s interest in obtaining the most efficient resolution of controversies, and  the shared interest of the several states in furthering fundamental substantive social policies.  
Asahi,
 480 U.S. at 113, 107 S. Ct. at 1033
; Guardian
, 815 S.W.2d at 229. 

“The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders.”  
Asahi
, 480 U.S. at 114, 107 S. Ct. at 1033.  The Supreme Court in 
Asahi
 further elaborated upon what must be considered in determining whether assertion of jurisdiction by a forum state would offend traditional notions of fair play and substantial justice:

The procedural and substantive interests of other nations in a state court’s assertion of jurisdiction over an alien defendant will differ from case to case.  In every case, however, those interests, as well as the Federal interest in Government’s foreign relations policies, will be best served by a careful inquiry into the reasonableness of the assertion of jurisdiction in the particular case, and an unwillingness to find the serious burdens on an alien defendant outweighed by minimal interests on the part of the plaintiff or the forum State.  “Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field.”    

 

Id.
 at 115, 107 S. Ct. at 1034 (citations omitted).

Analysis

Considering all the evidence presented to the trial court, we must determine whether HMS met its burden of establishing that assertion of in rem jurisdiction over the Airplane would offend traditional notions of fair play and substantial justice.  
See
 
Coleman
, 83 S.W.3d at 806-07; 
Kawasaki Steel,
 699 S.W.2d at 203.  The dispute in this case arises out of an alleged conversion of the Airplane that took place in Amman, Jordan.  There is no indication the Airplane was built in Texas or that any events between HMS and Layale transpired in Texas.  Layale is a Panamanian corporation which has stated that it registered the Airplane in the Cayman Islands, British West Indies.  HMS is a business operating under the laws of Jordan with offices in London, England and Amman, Jordan.  HMS’s owner is a citizen of Lebanon and resides in London and Beruit.  HMS’s President is a citizen of Egypt and resides in Paris, France.  The Sultan of Brunei, through whom Layale contends it purchased the Airplane, lives in Brunei.  HMS claims legal possession of the Airplane through a lease agreement with a Prince and Princess of the Hashemite Kingdom of Jordan.
(footnote: 9)  Therefore, it is apparent that all except one of the potential witnesses regarding the issue of possession, ownership, and conversion of the Airplane reside outside Texas, and most reside outside the United States.
(footnote: 10)  No one who asserts ownership or possession, or any of their witnesses except one, resides in Texas or has any minimum contacts in Texas.     

Quite understandably, when Layale became aware in 1996 that the Airplane had been located in Fort Worth, Layale took whatever legal measures it deemed appropriate under Texas law to sequester the Airplane.  However, there is nothing in the record to indicate that HMS and Layale had any dealings with each other in Texas prior to Layale initiating this lawsuit.  None of the events leading up to the parties disputing ownership or possession of the Airplane occurred in Texas or even in the United States.  None of the parties or their witnesses lived in Texas.  None of the documents alleged by the parties to support their respective positions of ownership or right of possession to the Airplane were signed or negotiated in Texas.  It was merely fortuitous that Layale discovered the Airplane temporarily located at Meacham Field in Fort Worth while the Airplane was being repaired and refurbished.   

Due to this almost complete lack of significant contacts with the State of Texas,
 we conclude that the interest of the State of Texas in litigating this dispute which seeks an adjudication of possession or title to the Airplane, when coupled with the burden upon HMS in having to defend its claim of possession to the Airplane in Texas, was unreasonable and offends traditional notions of fair play and substantial justice.  Therefore, we hold the trial court lacked in rem jurisdiction in this case.       

Conclusion

Because we conclude the trial court lacked in rem jurisdiction, we hold the court erred in denying the special appearance of HMS.  Accordingly, we reverse the judgment of the trial court and render judgment dismissing the case for lack of trial court jurisdiction. 

DIXON W. HOLMAN

JUSTICE

PANEL B: LIVINGSTON, DAUPHINOT, and HOLMAN, JJ.

DELIVERED:  August 25, 2004

FOOTNOTES
1:
If a court’s jurisdiction is based on its authority over the defendant’s person, the action and judgment are denominated “in personam” and can impose a personal obligation on the defendant in favor of the plaintiff.  
Shaffer v. Heitner
, 433 U.S. 186, 199, 97 S. Ct. 2569, 2577 (1977).  If jurisdiction is based on the court’s power over property within its territory, the action is called “in rem” or “quasi in rem.”  
Id.  
The effect of a judgment in an in rem or quasi in rem case is limited to the property that supports jurisdiction and does not impose a personal liability on the property owner.  
Id.
    

2:
HMS states the Airplane is a Boeing 727-2LR whereas Layale states the Airplane is a Boeing 727-200-2L4.  Both parties agree the manufacturer’s serial number is 21010.

3:
Attached to HMS’s February 17, 2004 motion to reinstate this appeal is an order from the trial court dated January 28, 2004, entitled “Order Requesting Expedited Jurisdictional Rulings From Court Of Appeals And Staying The Trial Of This Case.”  The order stays the trial of this case until the jurisdictional issues pending in this appeal are determined and requests that this court rule on the jurisdictional issues as quickly as possible because a resolution of those issues is likely to determine the outcome of the case.  We certainly appreciate the trial court’s concern and simply note that during the more than five years that this appeal was abated, this court received nothing in this case from any source notifying us that the federal court had remanded this case to the state court in February 1999.  

4:
Tex. R. Civ. P.
 120a, 25 
Tex. B.J.
 372 (1962) (added by order of April 12, 1962, effective Sept. 1, 1962).

5:
At the conclusion of the hearing on HMS’s special appearance, the trial judge stated his ruling and then informed the parties that he would withhold any hearings on HMS’s motion to increase the sequestration bond until the parties “have an opportunity to present this ruling to the Court of Appeals.”

6:
On April 21, 2004, Layale filed a motion in this court requesting we dismiss HMS’s appeal, alleging three actions of HMS that Layale contended constituted a general appearance in the trial court and warranted dismissal of HMS’s appeal.  On May 13, 2004, this court denied Layale’s motion to dismiss HMS’s appeal.  One of the actions stated in Layale’s motion was HMS’s filing of its  motion to increase the sequestration bond, which we have addressed in this opinion.  The other two actions alleged by Layale in support of its motion to dismiss HMS’s appeal were not mentioned, raised, or argued in Layale’s appellate brief; therefore, we do not address them in this opinion.    

7:
Bayazid testified that he was not entitled to any particular spot at the IAS facility, and “[a]s a matter of fact, they threw me out of the place that I was occupying because they needed -- they had another airplane coming in with several representatives and they needed the space and they asked me -- They didn’t ask me, they told me that ‘we’re moving you,’ so they moved me and they put my things in a box and now wherever I go there, I sit at the -- in the conference room or at the secretary’s desk or whatever.  I don’t have a space.”

8:
Page 12 of the December 5, 1996 contract is missing from Layale’s Exhibit 11 in the appellate record; the missing page appears to contain the text of all of section XIII and portions of section XII and XIV.

9:
We need not determine which country’s law applies to the causes of action alleged because that issue is not before us, and neither party has asserted that Texas law applies.  

10:
In response to an interrogatory asking HMS to identify officers, employees, or representatives of HMS who have had any contact with Texas, HMS listed twelve individuals who live in England, one who lives in the United Kingdom, four who live in France, one who lives in Florida, and one who lives in Dallas, Texas.  HMS subsequently explained that although it had listed a Dallas address for Robert Tunnell, a former flight engineer, Tunnell resided in Amman, Jordan when he was employed by HMS.