WATERMAN STEAMSHIP CORPORATION and Maersk Line, Limited, Appellants,

v.

Miguel RUIZ, John Cronan, and Richard E. Hicks, Appellees.

No. 01–10–00516–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Aug. 25, 2011.

James E. Wright, III, (Pro Hac Vice), William C. Baldwin, (Pro Hac Vice), New Orleans, LA, Robert Taylor Lemon II, Rebecca L. Clausen, Houston, for Appellants.

Brian A. Beckcom, Terry Bryant, Daryl L. Moore, Dennis M. McElwee, Houston, for Appellees.

Panel consists of Justices KEYES, HIGLEY, and BLAND.

## OPINION ON REHEARING

EVELYN V. KEYES, Justice.

Appellee John Cronan filed a motion for rehearing of our April 14, 2011 opinion. We grant rehearing, withdraw our April 14, 2011 opinion and judgment and issue this opinion and judgment in their place. The disposition of the case remains unchanged.

In this interlocutory appeal, appellants, Waterman Steamship Corporation ("Waterman") and Maersk Line, Limited ("Maersk"), appeal the trial court's order denying their special appearances. Appellees, Miguel Ruiz, John Cronan, and Richard Hicks, sued Waterman and Maersk for negligence under the Jones Act and general maritime law for injuries allegedly suffered during the hijacking of the M/V MAERSK ALABAMA by pirates off the coast of Somalia. In four issues on appeal,

Waterman and Maersk contend that the trial court erred in denying the special appearances because: (1) appellants did not waive their special appearances in this case by their actions in Hicks's earlier suit; (2) appellants lack sufficient minimum contacts with Texas to support the exercise of general jurisdiction; (3) exercising personal jurisdiction under these circumstances does not comport with traditional notions of fair play and substantial justice; and (4) the trial court erred in failing to file findings of fact and conclusions of law. Waterman additionally contends that its officer, Peter Johnston, had personal knowledge of the facts contained in his affidavit supporting its special appearance.

We affirm in part and reverse and render judgment in part.

## Background

On April 8, 2009, while the M/V MAERSK ALABAMA was en route from Djibouti to Kenya to deliver food aid cargo, pirates hijacked the vessel in the Gulf of Aden off the coast of Somalia. During the ensuing struggle, pirates took appellees, who were crewmembers on board the ALABAMA, hostage and held them in the steering room of the vessel. Appellees allegedly suffered severe injuries when they were "thrown about" by the pirates.

Richard Hicks, a Florida resident, first sued Waterman and Maersk on April 27, 2009, in Harris County, Texas ("the Hicks case"). The case was assigned to the 270th District Court of Harris County. Hicks sued appellants under the Jones Act and general maritime and common law, alleging that appellants' negligence and the vessel's unseaworthiness proximately caused his injuries. Hicks alleged that appellants "knowingly sent their employees ... into pirate-infested waters rather than take safer routes." Hicks contended that appellants knowingly exposed their employees to "grave and imminent danger" and did not take "adequate steps to provide appropriate levels of security and safety for [their] employees." Hicks sought recovery for past and future medical expenses, past and future pain and suffering and mental anguish damages, and past and future "maintenance and cure." In paragraph two of his original petition, Hicks alleged that both Waterman and Maersk were "foreign corporation[s] engaged in business in the State of Texas." He did not plead any other facts supporting personal jurisdiction over Waterman and Maersk.

Waterman is an Alabama corporation, with its principal place of business in Alabama. Maersk is a Delaware corporation, with its principal place of business in Virginia. Before filing a special appearance or answering in state court, appellants removed the Hicks case to federal court. In their federal answer, appellants contended that venue was improper in the Southern District of Texas because Hicks resides in Florida and neither appellant has a place of business in Harris County or in Texas. Appellants also asserted that the Southern District was an inconvenient forum because no witnesses for the case reside in Texas. Appellants set out their venue objection in a separate defense. Appellants then answered each of the numbered allegations from Hicks's petition. Regarding Hicks's paragraph two, appellants admitted that Hicks is a resident of Florida and that Waterman and Maersk are both foreign corporations. Appellants then denied the "remaining allegations contained in Paragraph II in the Original Petition," which included Hicks's allegation that Waterman and Maersk were "engaged in business in the State of Texas." Appellants did not move for dismissal based on lack of personal jurisdiction pursuant to

Federal Rule of Civil Procedure 12(b)(2). *See* FED.R.CIV.P. 12(b)(2).

While the Hicks case was pending in federal court, appellants propounded discovery requests. On September 16, 2009, the Southern District of Texas remanded the Hicks case to the 270th District Court of Harris County, Texas. Appellants did not file a special appearance or take any other action in the Hicks case after the federal court remanded it.

On October 6, 2009, Miguel Ruiz, a New York resident, also sued Waterman and Maersk in Texas state court ("the Ruiz case"). Ruiz's petition was substantively identical to Hicks's first petition, and this case was assigned to the 164th District Court of Harris County. On October 12, 2009, fellow crewmembers Husain Salah, Mohamed Abdelwaham, Andrew Brzezinski, Mario Clotter, and Hector Sanchez intervened in the Ruiz case.[1] On November 6, 2009, John Cronan, a Pennsylvania resident, also intervened in the Ruiz case. On December 1, 2009, Hicks nonsuited his case in the 270th District Court and intervened in the Ruiz case the next day.

Waterman and Maersk filed special appearances in response to Ruiz's original petition on December 18, 2009.[2] In their special appearances, Waterman and Maersk alleged that they were incorporated in Alabama and Delaware, respectively, and had their principal places of business in Alabama and Virginia, respectively. Both contended that the trial court could not exercise specific jurisdiction because the plaintiffs' cause of action did not arise out of or relate to any contacts either

defendant had with Texas. They further contended that the exercise of general jurisdiction was improper because most of their contacts with Texas were random, fortuitous, and attenuated, and the contacts did not rise to the level of purposeful availment of the benefits and protections of Texas law. Appellants finally contended that, even if the trial court could properly exercise general jurisdiction, this exercise would violate traditional notions of fair play and substantial justice because the case has no connection to Texas: all of the parties and witnesses reside in other states, no evidence exists in Texas, and the underlying incident occurred off the coast of Somalia.

Appellees objected to the special appearance affidavit of Peter Johnston, Waterman's Executive Vice President, on the ground that he lacked personal knowledge of the affidavit's contents. Appellees raised this argument at the special appearance hearing, but the trial court never specifically ruled on this objection and it never struck Johnston's affidavit as incompetent special appearance evidence.

The trial court denied Waterman's and Maersk's special appearances. Both appellants requested findings of fact and conclusions of law. However, they appealed to this court before the trial court could issue findings and conclusions. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(7) (Vernon 2008) (allowing interlocutory appeal from order denying special appearance).

### Waiver of Special Appearance

In their first issue, appellees contend that Waterman and Maersk waived

---

1. Salah and Clotter reside in New York, Abdelwaham resides in Minnesota, Brzezinski resides in Massachusetts, and Sanchez resides in Pennsylvania. None of these intervenors are parties to this appeal.

2. Appellants filed identical special appearances in response to Cronan's and Hicks's petitions in intervention on December 30, 2009, and January 8, 2010, respectively. It is undisputed that the special appearances were the first instruments filed by Waterman and Maersk in the Ruiz case.

their special appearances in the Ruiz case because they did not contest the exercise of personal jurisdiction in state or federal court in the first-filed Hicks case. Waterman and Maersk contend that Hicks's nonsuit of his original petition extinguished any waiver of their objections to personal jurisdiction, and thus Waterman and Maersk did not waive their special appearances in the Ruiz case. We agree with Waterman and Maersk.

Under the Texas Rules of Civil Procedure, "[a]t any time before the plaintiff has introduced all of his evidence other than rebuttal evidence, the plaintiff may dismiss a case, or take a non-suit, which shall be entered in the minutes." Tex.R. Civ. P. 162; *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex.2010). A nonsuit "extinguishes a case or controversy from 'the moment the motion is filed' or an oral motion is made in open court...." *Univ. of Tex. Med. Branch at Galveston v. Estate of Blackmon ex rel. Shultz*, 195 S.W.3d 98, 100 (Tex.2006) (per curiam) (quoting *Shadowbrook Apartments v. Abu–Ahmad*, 783 S.W.2d 210, 211 (Tex. 1990) (per curiam)). A nonsuit of the plaintiff's cause of action "is not an adjudication of the rights of the parties and does not extend to the merits of the action; it merely puts them back in the position they were in before the lawsuit was brought." *Parker v. JPMorgan Chase Bank*, 95 S.W.3d 428, 431–32 (Tex.App.-Houston [1st Dist.] 2002, no pet.); *Rexrode v. Bazar*,

937 S.W.2d 614, 619 (Tex.App.-Amarillo 1997, no writ) ("[A] non-suit is a termination of the pleaded causes of action and asserted defenses without an adjudication of their merits that returns the litigants to the positions they occupied before the plaintiff invoked the court's jurisdiction."); *see also Houston Indep. Sch. Dist. v. Morris*, No. 01–10–00043–CV, 2011 WL 1936005, at *7 (Tex.App.-Houston [1st Dist.] May 19, 2011, no pet. h.) ("When the Taxing Units nonsuited their claims for delinquent taxes, the Taxpayers' affirmative defense became moot...."). Although a nonsuit may vitiate certain interlocutory orders, rendering them moot and unappealable, a plaintiff's decision to nonsuit his claims does not affect a defendant's right to be heard on a pending claim for affirmative relief.[3] *See* Tex.R. Civ. P. 162; *Villafani v. Trejo*, 251 S.W.3d 466, 469 (Tex.2008).

Here, Hicks first sued Waterman and Maersk on April 27, 2009, in Texas state court. This case was assigned to the 270th District Court. Hicks did not allege that Waterman and Maersk committed a tort in Texas, nor did he plead specific bases for personal jurisdiction; instead, Hicks merely stated that Waterman and Maersk were both foreign corporations "engaged in business in the State of Texas."

After Waterman and Maersk removed the Hicks case to federal court, they answered and, in their first defense, asserted

---

**3.** In addition, a plaintiff's nonsuit "cannot extinguish a defendant's counterclaim for costs and attorney's fees," and a nonsuit "cannot be used to disturb a court's judgment on the merits of a claim, such as a partial summary judgment against the nonsuiting party." *Villafani v. Trejo*, 251 S.W.3d 466, 469 (Tex.2008); *Hyundai Motor Co. v. Alvarado*, 892 S.W.2d 853, 854–55 (Tex.1995) (per curiam) ("A decision on the merits, such as a summary judgment, however, is not vitiated."); *see also Le v. Kilpatrick*, 112 S.W.3d

631, 634 (Tex.App.-Tyler 2003, no pet.) (holding that nonsuit vitiates order denying special appearance because such order does not "reflect[ ] any judgment on the merits of the case"). Here, it is undisputed that Waterman and Maersk did not assert any claims for affirmative relief or counterclaims for costs and attorney's fees in the Hicks case. It is also undisputed that neither the state nor the federal district court issued any rulings on the merits of the case before Hicks nonsuited his claims.

that venue was improper in the Southern District of Texas and that this district was an inconvenient forum because no parties or witnesses reside in Texas. Although Waterman and Maersk asserted nine other defenses, they did not state an objection to personal jurisdiction in a separate defense. Waterman and Maersk did, however, answer the specific allegations included in Hicks's petition. Waterman and Maersk stated the following:

> With regard to the allegations contained in Paragraph II, subparagraph 1, it is admitted that the plaintiff is a resident of the Royal Palm Beach, Florida. With respect to the allegations of Paragraph II, subparagraphs 2 and 3, it is admitted that Waterman and [Maersk] are a foreign corporations. The remaining allegations contained in Paragraph II in the original petition are denied.

Paragraph II, subparagraphs 2 and 3, contained Hicks's statement that Waterman and Maersk "engaged in business in the State of Texas." Waterman and Maersk did not make a separate motion objecting to personal jurisdiction under Federal Rule 12(b).

The court for the Southern District of Texas remanded the Hicks case to the 270th District Court on September 16, 2009. On October 6, 2009, Ruiz filed a substantively identical suit in Harris County, and this case was assigned to the 164th District Court.[4] Over the next two months, several of Ruiz's crewmembers, including Cronan, intervened in his suit. On December 1, 2009, Hicks nonsuited his case and immediately intervened in the Ruiz case. Waterman and Maersk filed a special appearance in the Ruiz case on December 18, 2009.

When Hicks nonsuited his case, the effect of this action was to extinguish his causes of action against Waterman and Maersk and to return the parties to the positions they were in before Hicks invoked the jurisdiction of the trial court. *See Estate of Blackmon,* 195 S.W.3d at 100; *Parker,* 95 S.W.3d at 431–32; *Rexrode,* 937 S.W.2d at 619. As a result of the nonsuit, it was as if Hicks had never brought suit against Waterman and Maersk in the first place. *See Hagberg v. City of Pasadena,* 224 S.W.3d 477, 484 (Tex.App.-Houston [1st Dist.] 2007, no pet.) ("When a party nonsuits a legal action, the parties are put back in the same positions as before the filing of the suit."); *KT Bolt Mfg. Co. v. Tex. Elec. Coops., Inc.,* 837 S.W.2d 273, 275 (Tex. App.-Beaumont 1992, writ denied) ("[A nonsuit] merely places [the parties] in the position that they were in before the court's jurisdiction was invoked just as if the suit had never been brought."); *see also Bailey v. Gardner,* 154 S.W.3d 917, 920 (Tex.App.-Dallas 2005, no pet.) (holding same). Thus, even if Waterman and Maersk waived their objections to personal jurisdiction in the Hicks case—a matter we need not decide because Hicks's nonsuit returned the parties to their pre-filing positions—any waiver in the Hicks case was extinguished by the nonsuit and cannot operate as a basis for denying Waterman's and Maersk's special appearances in the Ruiz case.

**4.** We note that Harris County Local Rule 3.2.3(a) provides: "Subject to subpart c, a motion to consolidate cases must be heard in the court where the first filed case is pending. If the motion is granted, the consolidated case will be given the number of the first filed case and assigned to that court." HARRIS CNTY. (TEX.) CIV. DIST. LOC. R. 3.2.3(a). Furthermore, "[a]ny matter filed after a non-suit, dismissal for want of prosecution, or other disposition of a previous filing involving substantially-related parties and claims shall be assigned by the Administrative Judge of the Civil Trial Division to the court where the prior matter was pending." *Id.* 3.2.2.

Cronan, citing the Fort Worth Court of Appeals' decision in *Reynolds v. Murphy*, 266 S.W.3d 141 (Tex.App.-Fort Worth 2008, pet. denied), argued that Rule 162 "does not vitiate the effect of a trial court's previous rulings or divest a trial court of personal jurisdiction over a defendant to decide matters in a second suit that have already been decided in a previously filed suit." In *Reynolds,* after the trial court, on remand, granted the defendant's motion to strike the additional causes of action asserted in the plaintiff's third amended petition, filed after the remand, the plaintiff nonsuited and appealed. *Id.* at 144. In response to the defendant's argument on appeal that the nonsuit rendered the case and appeal moot, the Fort Worth court concluded that the trial court's ruling essentially dismissed the newly asserted claims with prejudice and was analogous to a partial summary judgment, which is a ruling on the merits. *Id.* at 146. As a result, the plaintiff's nonsuit did not vitiate the trial court's ruling, and the court held that it had jurisdiction over the appeal. *Id.*

A nonsuit "cannot be used to disturb a court's judgment on the merits of a claim," but the Texas Supreme Court has also held that a nonsuit can "vitiate certain interlocutory orders." *See Villafani,* 251 S.W.3d at 469 (citing *Estate of Blackmon,* 195 S.W.3d at 101 (holding that nonsuit mooted interlocutory appeal of denial of plea to the jurisdiction and deprived court of appeals of jurisdiction)); *Le v. Kilpatrick,* 112 S.W.3d 631, 634 (Tex.App.-Tyler 2003, no pet.) (holding that nonsuit vitiated order denying special appearance). Here, neither the state nor the federal district court had issued any interlocutory rulings, on the merits or otherwise, at the time Hicks nonsuited his case.[5]

We conclude that the nonsuit in the Hicks case had the effect of extinguishing any waiver by Waterman and Maersk of their objections to personal jurisdiction. Thus, we hold that appellees cannot use any alleged waiver in the Hicks case to establish waiver of the special appearances in the Ruiz case. Because the special ap-

---

5. Cronan also cites the Texas Supreme Court's statement in *Villafani* that a nonsuit "does not purport to limit the trial court's power to act" for the proposition that Rule 162 does not prohibit the trial court from exercising personal jurisdiction over a defendant who had previously generally appeared in a nonsuited case. We note that this statement was made in the context of determining whether a trial court can act on a sanctions motion after the plaintiff files a nonsuit, but still within the time period of the trial court's plenary jurisdiction. 251 S.W.3d at 469 (quoting *Scott & White Mem'l Hosp. v. Schexnider,* 940 S.W.2d 594, 596 (Tex.1996)). The court noted that, in *Schexnider,* it held that "Rule 162 did not affect a trial court's authority to hear motions for sanctions during its plenary jurisdiction" and it further held, in *Villafani,* that Rule 162 does not prevent a non-moving party from appealing rulings on claims for affirmative relief that the trial court issued prior to the nonsuit. *Id.* at 470; *see also Travelers Ins. Co. v. Joachim,* 315 S.W.3d 860, 865 (Tex.2010) (holding that trial court retains limited authority to dispose of case after nonsuit filed); *Univ. of Tex. Med. Branch at Galveston v. Estate of Blackmon ex rel. Shultz,* 195 S.W.3d 98, 101 (Tex.2006) (per curiam) ("Although [Rule 162] permits motions for costs, attorney's fees, and sanctions to remain viable in the trial court, it does not forestall the nonsuit's effect of rendering the merits of the case moot."). We do not read the rulings in *Schexnider* and *Villafani* as broadly as Cronan suggests—namely, that a trial court may automatically exercise personal jurisdiction over a defendant in a suit following a nonsuit if the defendant generally appeared in the first suit before the plaintiff filed the nonsuit. This interpretation conflicts with well-established case law holding that a nonsuit extinguishes the case and returns the parties to their positions before the plaintiff invoked the trial court's jurisdiction, with a few exceptions not applicable here. *See, e.g., Villafani,* 251 S.W.3d at 469.

pearances were the first instruments filed by Waterman and Maersk in the Ruiz case, we hold that they did not waive their objections to personal jurisdiction. *See* Tex.R. Civ. P. 120a(1) ("Such special appearance shall be made by sworn motion filed prior to motion to transfer venue or any other plea, pleading or motion....").

### Evidentiary Objection

■ In its third issue, Waterman contends that Peter Johnston, its Executive Vice President and an officer of Waterman, had personal knowledge of the contents of his special appearance affidavit and thus his affidavit was competent to support its special appearance. We address this contention before addressing the merits of Waterman's special appearance.

■ Texas Rule of Civil Procedure 120a(3) provides that the affidavits, if any, in support of a special appearance shall be "made on personal knowledge, shall set forth specific facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify." Tex.R. Civ. P. 120a(3). A corporate officer may testify that information concerning the company's contacts with the forum state is within his personal knowledge "without showing with particularity how he acquired that knowledge." *M.G.M. Grand Hotel, Inc. v. Castro,* 8 S.W.3d 403, 407 (Tex.App.-Corpus Christi 1999, no pet.); *see also Exito Elecs. Co. v. Trejo,* 99 S.W.3d 360, 372 (Tex.App.-Corpus Christi 2003) ("With regard to the personal knowledge of corporate representatives, officers such as vice-presidents, secretaries, and board presidents may testify to facts regarding the corporation's activities."), *rev'd on other grounds,* 142 S.W.3d 302 (Tex. 2004) (per curiam). Even if an affiant later states that his affidavit testimony was based on his review of corporate business records, the affiant's "acknowledgement of the sources from which he gath-

ered his knowledge does not violate the personal knowledge requirement." *In re E.I. DuPont de Nemours & Co.,* 136 S.W.3d 218, 224 (Tex.2004); *see also Asshauer v. Glimcher Realty Trust,* 228 S.W.3d 922, 926 (Tex.App.-Dallas 2007, no pet.).

Peter Johnston is Waterman's Executive Vice President. In his affidavit, he stated that he had personal knowledge of the facts contained in the affidavit and that those facts were true and correct. Johnston averred that only two of the crewmembers of the M/V MAERSK ALABAMA were Texas residents and that neither of those crewmembers was a party to this lawsuit. He also described the process of hiring crewmembers through various unions and the isolated port calls by Waterman-owned ships to Texas ports. He further averred that Waterman did not have an office, bank account, property, telephone listing, registered agent, or employees in Texas. Johnston also stated that Waterman did not advertise in Texas and was not registered to do business in Texas.

During Johnston's deposition, Cronan's counsel went through Johnston's affidavit and asked him how he had obtained knowledge of each specific averment. For example, when asked how Johnston was aware of the residences of the MAERSK ALABAMA crewmembers, Johnston responded that Waterman's crewing department provided him with that information, and Johnston then agreed with counsel's follow-up question that that information "was not something within [his] personal knowledge before [he] went and asked a third party the answer." Johnston testified that he obtained the following information from third parties before making his affidavit: (1) whether Waterman was registered to do business in Texas; (2) whether Waterman had a registered agent or employees working in Texas; (3) wheth-

er Waterman had an office, bank account, property, or phone listing in Texas; and (4) what the union protocols were for hiring crewmembers. Appellees contend that, because Johnston relied upon third parties and business records to obtain this information, he lacked personal knowledge of the facts recited in his affidavit, and therefore the affidavit was "no evidence" of Waterman's Texas contacts.

As a corporate officer, Johnston may testify that facts concerning Waterman's contacts with Texas are within his personal knowledge without specifying how he obtained that knowledge. *See Castro,* 8 S.W.3d at 407; *see also Trejo,* 99 S.W.3d at 372 (holding that corporate officers can testify to facts regarding corporation's activities). The fact that Johnston acknowledged that he learned of the specific information concerning Waterman's Texas contacts from third parties and business records before making his affidavit "does not violate the personal knowledge requirement." *See E.I. DuPont de Nemours,* 136 S.W.3d at 224; *see also Asshauer,* 228 S.W.3d at 926. We therefore hold that Johnston had personal knowledge of the facts contained within his affidavit, and the trial court could properly consider this affidavit when determining Waterman's special appearance.[6]

### Personal Jurisdiction Standard of Review

◼ Whether a court has personal jurisdiction over a defendant is a question of law that we review de novo. *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 794; *Glattly v. CMS Viron Corp.,* 177 S.W.3d 438, 445 (Tex.App.-Houston [1st Dist.] 2005, no pet.). Before determining the jurisdictional question, the trial court must frequently resolve questions of fact. *BMC Software,* 83 S.W.3d at 794. If the trial court does not issue findings of fact and conclusions of law, "all facts necessary to support the judgment and supported by the evidence are implied." *Id.* at 795. Under these circumstances, we presume that the trial court resolved all factual disputes in favor of its judgment. *Tri–State Bldg. Specialties, Inc. v. NCI Bldg. Sys., L.P.,* 184 S.W.3d 242, 246 (Tex.App.-Houston [1st Dist.] 2005, no pet.) (citing *Am. Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 806 (Tex.2002)). These findings are not conclusive when the appellate record includes both the clerk's and reporter's records, and a party may challenge these findings for legal and factual sufficiency on appeal. *Id.* To the extent that the underlying facts are undisputed, however, we conduct a de novo review. *Glattly,* 177 S.W.3d at 445.

### Requirements for Personal Jurisdiction

◼ Two requirements must be met before a Texas court can exercise personal jurisdiction over a nonresident defendant. First, the Texas long-arm statute must

**6.** Even if Johnston lacked personal knowledge and his affidavit was, therefore, defective, Waterman still presented evidence supporting its special appearance. Rule 120a(3) does not require a party to file affidavits supporting a special appearance, and the rule provides that the trial court "shall determine the special appearance on the basis of the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony." TEX.R. CIV. P. 120a(3); *see also Exito Elecs. Co. v. Trejo,* 142 S.W.3d 302, 307 (Tex.2004) (noting that, in addition to corporate officer's affidavit, record also contained pleadings and deposition of Exito's corporate representative). The special appearance record in this case contained Johnston's affidavit, as well as the depositions of Johnston and Mike Cameron, both of whom testified to the information contained in Johnston's affidavit.

authorize the exercise of jurisdiction; and, second, the exercise of jurisdiction must comport with federal due process guarantees. *Coleman,* 83 S.W.3d at 806; *Tri–State,* 184 S.W.3d at 248.

 Pursuant to the long-arm statute, Texas courts can exercise personal jurisdiction over a nonresident defendant that "does business" in Texas. TEX. CIV. PRAC. & REM.CODE ANN. § 17.042 (Vernon 2008); *BMC Software,* 83 S.W.3d at 795. The statute lists three activities that constitute "doing business" in Texas: (1) contracting with a Texas resident when either party is to perform the contract in whole or in part in Texas; (2) committing a tort in whole or in part in Texas; and (3) recruiting Texas residents for employment inside or outside of Texas. TEX. CIV. PRAC. & REM.CODE ANN. § 17.042. This list, however, is not exclusive, and the "doing business" requirement is limited only by the requirements of federal due process. *Koll Real Estate Group, Inc. v. Purseley,* 127 S.W.3d 142, 146 (Tex. App.-Houston [1st Dist] 2003, no pet.) (citing *Schlobohm v. Schapiro,* 784 S.W.2d 355, 356 (Tex.1990)); *see also CSR Ltd. v. Link,* 925 S.W.2d 591, 594 (Tex.1996). In practice, these two conditions are combined into one requirement of due process. *Wright v. Sage Eng'g Inc.,* 137 S.W.3d 238, 247 (Tex.App.-Houston [1st Dist.] 2004, pet. denied); *see also Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex. 1991) ("[W]e consider only whether it is consistent with federal constitutional requirements of due process for Texas courts to assert *in personam* jurisdiction over Guardian Royal.").

 With respect to personal jurisdiction, federal due process requires two things. First, the non-resident defendant must have purposefully established such minimum contacts with the forum state that the defendant could reasonably antici-pate being sued there. *Glattly,* 177 S.W.3d at 447 (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475–76, 105 S.Ct. 2174, 2183–84, 85 L.Ed.2d 528 (1985)). Second, if the non-resident defendant has purposefully established minimum contacts with the forum state, the exercise of personal jurisdiction must comport with traditional notions of fair play and substantial justice. *Id.* (citing *Burger King,* 471 U.S. at 475–76, 105 S.Ct. at 2183–84). The defendant bears the burden of presenting a "compelling case" that exercising jurisdiction over it would not be fair and just. *See id.* at 450. Only in rare cases will a Texas court's exercise of personal jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts. *Guardian Royal,* 815 S.W.2d at 231.

 The plaintiff bears the initial burden of pleading jurisdictional facts sufficient to bring a non-resident defendant within the provisions of the Texas long-arm statute. *Kelly v. Gen. Interior Constr., Inc.,* 301 S.W.3d 653, 658 (Tex. 2010). To establish jurisdiction over a non-resident defendant, the plaintiff must plead a "connection between the defendant['s] alleged wrongdoing and the forum state." *Id.* at 655; *Touradji v. Beach Capital P'ship, L.P.,* 316 S.W.3d 15, 23 (Tex.App.-Houston [1st Dist.] 2010, no pet.). In a tort case, the plaintiff must plead that the defendant committed a tortious act in Texas. *Kelly,* 301 S.W.3d at 659; *Touradji,* 316 S.W.3d at 23.

 A nonresident defendant challenging the court's exercise of personal jurisdiction through a special appearance bears the burden of negating all grounds for personal jurisdiction alleged by the plaintiff. *Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 574 (Tex.2007).

The defendant can negate jurisdiction on either a factual or legal basis. *Kelly,* 301 S.W.3d at 659; *RSR Corp. v. Siegmund,* 309 S.W.3d 686, 699 (Tex.App.-Dallas 2010, no pet.). To negate personal jurisdiction on a factual basis, the defendant can produce evidence showing that it has no contacts with Texas, which the plaintiff may then counter with its own evidence. *Kelly,* 301 S.W.3d at 659. To negate jurisdiction on a legal basis, the defendant can establish that, even taking the alleged jurisdictional facts as true, "the defendant's contacts with Texas fall short of purposeful availment . . . or that traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction." *Id.; Siegmund,* 309 S.W.3d at 699.

## Minimum Contacts

### A. *Standard of Review*

In their first issue, appellants contend that they are not subject to personal jurisdiction in Texas because they have not established minimum contacts with Texas.

A non-resident defendant establishes minimum contacts with Texas by purposefully availing itself of the privileges and benefits inherent in conducting business in Texas. *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 784 (Tex.2005); *see also Kelly,* 301 S.W.3d at 660 ("[J]urisdictional analysis always centers on the *defendant's* actions and choices to enter the forum state and conduct business.") (emphasis in original). There are three aspects to the "purposeful availment" inquiry: (1) we consider only the defendant's contacts with the forum state, not the unilateral activities of third parties or persons; (2) the contacts relied upon must be purposeful, and not random, isolated, or fortuitous; and (3) the defen-

dant must seek some benefit, advantage, or profit by availing itself of the jurisdiction. *Holten,* 168 S.W.3d at 785. When undertaking a minimum contacts analysis, we consider the quality and nature of the defendant's contacts, rather than their number. *Trigeant Holdings, Ltd. v. Jones,* 183 S.W.3d 717, 725 (Tex.App.-Houston [1st Dist.] 2005, pet. denied). The defendant's activities, whether they consist of acts inside or outside of Texas, must "justify a conclusion that the defendant could reasonably anticipate being called into a Texas court." *Siegmund,* 309 S.W.3d at 698 (citing *Coleman,* 83 S.W.3d at 806).

The minimum contacts analysis is further divided into specific and general jurisdiction.[7] A court may exercise general jurisdiction if the defendant's contacts with the forum state are continuous and systematic, even if the cause of action did not arise out of or relate to the defendant's contacts with the forum. *Glattly,* 177 S.W.3d at 447. The minimum contacts analysis involved when general jurisdiction is asserted is more demanding than when a plaintiff asserts specific jurisdiction. *Coleman,* 83 S.W.3d at 807. In a general jurisdiction analysis, we do not view each contact in isolation, but instead investigate, compile, sort, and analyze all contacts "for proof of a pattern of continuing and systematic activity." *Id.* at 809. To satisfy the requirements of general jurisdiction, "[u]sually, the defendant must be engaged in longstanding business in the forum state, such as marketing or shipping products, or performing services or maintaining one or more offices there; activities that are less extensive than that will not qualify for general in personam jurisdiction." *PHC–Minden, L.P. v. Kimberly–Clark Corp.,* 235 S.W.3d 163, 168 (Tex.2007)

---

7. Appellees do not contend that Waterman and Maersk are subject to specific jurisdiction; thus, we address only general jurisdiction.

(quoting 4 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1067.5 (2007)); *Touradji,* 316 S.W.3d at 25.

### B. Waterman's Contacts with Texas

On appeal, appellees contend that Waterman has "continuous and systematic" contacts with Texas, which subject it to general jurisdiction.[8] Appellees do not dispute Waterman's contentions that: (1) it is not registered to do business in Texas; (2) it does not have a registered agent, office, property, mailing address, bank account, or phone listing in Texas; (3) it does not maintain business records in Texas; (4) it has not received revenue from a Texas entity or person; (5) it has not solicited business in Texas or had a Texas customer; and (6) it has not marketed its services or directed advertising toward Texas.

#### 1. Calls upon Texas Ports

■ During the jurisdictional discovery period, five Waterman vessels made a total of eighteen calls on Texas ports while under time-charter to third-party customers of Waterman. In his deposition, Peter Johnston, Waterman's Executive Vice President, testified that, under a time charter, Waterman is responsible for crewing the vessel, performing maintenance, ensuring regulatory compliance, issuing orders to the master and the crew, operating the vessel, and determining the particular course. The time-charterer gives the master the "voyage instructions": where to go, the ports to call upon, the specific cargo to unload at particular ports, and the itinerary for the voyage. Johnston stated that "most" of Waterman's vessels are time-chartered to third parties, and all of the calls upon Texas ports were made at the direction of third-party charterers. For example, the Waterman vessel GREEN BAY made one call on a Texas port in May 2009 at the direction of the federal government to pick up military cargo located in Texas.

We do not construe Waterman's Texas port calls as "substantial contacts of a quality sufficient to establish a court's general jurisdiction over a nonresident defendant." *Uche v. Allison,* 264 S.W.3d 90, 100 (Tex.App.-Houston [1st Dist.] 2007, pet. denied); *see also Asarco, Inc. v. Glenara, Ltd.,* 912 F.2d 784, 787 (5th Cir.1990) (finding no jurisdiction and discounting quality of twenty calls on Louisiana ports because managing company did not choose destination of particular ports); *Nicolaisen v. Toei Shipping Co.,* 722 F.Supp. 1162, 1165 (D.N.J.1989) (seventeen port calls during four year period did not establish general jurisdiction when made at direction of third-party time-charterer). The quality of port calls as a contact is further diminished when a third-party determines the location of the call. *See Farwah v. Prosperous Maritime Corp.,* 220 S.W.3d 585, 591 (Tex.App.-Beaumont 2007, no pet.) ("Generally, with respect to vessel owners and managers who do not direct the itinerary of the vessel, port calls are not construed as substantial contacts of a quality sufficient to establish a court's general jurisdiction over a nonresident defendant."); *see also Coleman,* 83 S.W.3d at 809 (discounting quality of defendant's attendance at conferences in Texas when defendant did not choose location); *Reyes v. Marine Drilling Cos.,* 944 S.W.2d 401, 402–04 (Tex. App.-Houston [14th Dist.] 1997, no writ) (discounting quality of at least 200 trips to Texas to perform inspections required un-

---

8. The parties entered into a Rule 11 agreement during jurisdictional discovery limiting the time period for determining contacts with Texas from January 1, 2003, to October 6, 2009, the date Ruiz sued. We refer to this time as the "jurisdictional discovery period."

der contractual obligations with federal government).

Waterman made eighteen port calls over a nearly seven year time period, which is better characterized as sporadic rather than "continuous and systematic" contacts. *See Asarco*, 912 F.2d at 787. Furthermore, Waterman presented evidence that it called upon Texas ports only at the direction of third-party time-charterers, who determined the specific destinations for the vessel, and that Waterman did not make the decision to take its vessels to Texas. *See Farwah*, 220 S.W.3d at 592. We therefore conclude that the third-party time-chartered calls upon Texas ports by Waterman vessels are insufficient, standing alone, to establish general jurisdiction over Waterman because Waterman "lacked control over the decisions that led to the vessels calling on Texas ports." *Id.*

### 2. Purchases of Goods and Services from Texas Vendors

Appellees further contend that Waterman paid "millions" to Texas vendors while its vessels were in Texas ports, it contracted with Texas residents and companies, and it had vessels and barges inspected and repaired in Texas ports.[9]

Mike Cameron, Waterman's Vice President of Fleet Services, testified in his deposition that when a Waterman vessel calls upon a port, Waterman appoints a "port agent" and authorizes that agent to "carry out the necessary husbanding services for the vessel" while it is in port.[10] According to Cameron, Waterman's Purchasing Department, not the port agent, handles the purchase of fuel, stores, food, and other supplies while in port. During the jurisdictional discovery period, Waterman purchased $2,000,000 in goods and services, including vessel repairs, while its vessels were located in Texas ports. All of Waterman's purchases and contracts with Texas vendors occurred in conjunction with third-party time-chartered port calls or federal government contracts.

Cameron also testified that Waterman paid for inspections and repairs to barges located in Texas ports. Cameron stated that Waterman contracted with the federal government to deliver food-aid cargo, and the United States Department of Agriculture required inspections and repairs to barges before loading the cargo to ensure that the barges were in an acceptable condition for the transport. Waterman bid on the available food-aid contracts with the federal government "knowing that a number of the shipments would be out of Texas ports." According to Cameron, Waterman engaged in these shipments "very infrequent[ly]." Cameron testified that the government, not Waterman, determines the particular port from which the cargo is loaded onto Waterman barges and vessels.

In his affidavit, Johnston averred that Waterman purchased two vessels from a Dutch company in 2004, both of which, the BUENOS AIRES and the SANTA CRUZ, were located in Houston at the time of purchase. These vessels remained in the Port of Houston for approximately three weeks while they received "minor modifications" and were re-flagged to the United States flag.

---

9. Appellees contend that Waterman had vessels dry docked in Texas. Peter Johnston testified that Waterman had not had a vessel dry docked in Texas for the past fifteen years, outside the agreed period for jurisdictional discovery.

10. Peter Johnston testified that the time-charterer gives "specific instructions" regarding "which agents to use at what ports," and the charterer, not Waterman, appoints the port agents.

■ Mere purchases or their equivalent, even if occurring at regular intervals, are insufficient to warrant the exercise of personal jurisdiction over the non-resident defendant when the purchases do not relate to the cause of action. *See Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 418, 104 S.Ct. 1868, 1874, 80 L.Ed.2d 404 (1984); *PHC–Minden,* 235 S.W.3d at 170; *Coleman,* 83 S.W.3d at 808; *BMC Software,* 83 S.W.3d at 798 ("BMCB's unrelated purchases in Texas from BMCS are not the type of contacts that justify a finding that BMCB could have 'reasonably anticipate[d] being haled into court' here."); *Farwah,* 220 S.W.3d at 593 ("Even if the evidence supported a finding that Valles conducted business on as many as 265 days during that twenty-seven month period, the nature of the contacts, consisting of the purchase of necessary services and supplies for the vessel, is not sufficiently continuous and not of a sufficient quality to satisfy the requirements of the Constitution."). Repairs, including the purchase of inspection and reflagging services, are construed as "purchases" under *Helicopteros,* and not as separate and distinct contacts. *See HMS Aviation v. Layale Enters., S.A.,* 149 S.W.3d 182, 194–95 (Tex.App.-Fort Worth 2004, no pet.).

We also consider whether "the choice to do business in Texas" was Waterman's or "merely a coincidence because of another entity's decision to direct the vessels to Texas." *See Farwah,* 220 S.W.3d at 594. In *Farwah,* the Beaumont Court of Appeals held that the only reason Valles purchased supplies and entered into contracts in Texas was that Standard Tankers, the charterer, chose Texas ports of call and, therefore, this arrangement "diminish[ed] the quality of Valles's contacts" and supported a ruling that Valles did not purposefully direct business activity to Texas. *Id.*

■ Here, during the jurisdictional discovery period, Waterman purchased approximately $2,000,000 in necessary goods and services, including inspection and repair services, from Texas vendors. Waterman's special appearance evidence indicates that Waterman made these purchases when its vessels called upon Texas ports at the direction of third-parties and when the federal government directed Waterman to load food-aid cargo in Texas ports and Waterman's barges needed inspection and repairs pursuant to its contractual obligations with the government. In each instance where Waterman contracted with third-parties to transport food-aid cargo, the commodities were located in Houston, but Waterman's vessels were located either in New Orleans or, on one occasion, Galveston. Waterman had to use barges to transport the commodities to its vessels. Because the commodities included food, both the commodities and the barges had to be inspected to ensure that Department of Agriculture standards were met. The only reasonable place to inspect the commodities and barges prior to loading in the Port of Houston was the shipyards and inspection stations located in and around that port. There is no evidence that Waterman obtained barge inspections in Texas that were not connected to any of its food-aid transport contracts. When Waterman needed to load food-aid cargo in Texas and the barge needed repairs before the voyage, Waterman contracted for repair services in Texas as a "cost-effective measure." Appellees argue that this statement "undermines" Waterman's assertion that its contacts with Texas were at the direction of a third party.

Even if Waterman obtained repairs to its vessels and barges in Texas, these contracts and purchases, by themselves, are

still insufficient to support the exercise of general jurisdiction. *See Helicopteros,* 466 U.S. at 418, 104 S.Ct. at 1874; *HMS Aviation,* 149 S.W.3d at 194–95 (holding purchase of repair services insufficient to support general jurisdiction even though HMS Aviation brought planes to Texas solely for purpose of obtaining repairs). There is no evidence that Waterman entered into any other contracts with Texas residents. We therefore conclude that Waterman's $2,000,000 in purchases of goods and services from Texas vendors, standing alone, does not establish general jurisdiction.

■■■■■ Appellees additionally assert that Waterman regularly contacted Texas residents, such as the Houston office of the American Bureau of Shipping ("ABS"), "regarding vessel inspections, surveys, testing, and other services performed on Waterman's vessels." Minimum contacts "may not be satisfied by merely engaging in communications with a Texas corporation during performance of a contract." *Credit Commercial de France, S.A. v. Morales,* 195 S.W.3d 209, 220–21 (Tex. App.-San Antonio 2006, pet. denied); *see also Freudensprung v. Offshore Technical Servs., Inc.,* 379 F.3d 327, 344 (5th Cir. 2004) ("Moreover, this Court has repeatedly held that the combination of mailing payments to the forum state, engaging in communications related to the execution and performance of the contract, and the existence of a contract between the nonresident defendant and a resident of the forum state are insufficient to establish the minimum contacts necessary to support the exercise of specific personal jurisdiction over the nonresident defendant."). Any communication between Waterman and ABS or any other entity providing services to Waterman's vessels is merely incidental to "developing and carrying out the contractual obligations," and therefore does not constitute purposeful availment of

the benefits and protection of Texas law. *See Morales,* 195 S.W.3d at 220–21.

### 3. Employment of Texas Residents

■■■■ Appellees contend that Waterman has employed hundreds of Texas residents since 2003 and that it had a "continuing contractual relationship" with a Texas crewmember of the MAERSK ALABAMA, and therefore this factor supports the exercise of general jurisdiction. Waterman acknowledges that it has employed approximately 200 Texas mariners since 2003 and that two of the crewmembers on the MAERSK ALABAMA were Texas residents, but it contends that this is not a purposeful contact because it hired all mariners pursuant to union protocols, it had limited discretion to reject a mariner chosen by the unions, and it could not solicit or recruit employees from a particular state.

In his deposition, Mike Cameron testified regarding the procedure for hiring mariners for Waterman's vessels. Cameron testified that Waterman contracts with three seafarers' unions. When Waterman needs a crew, it sends a job order to the national union headquarters. The national union then contacts the union hall located closest to the vessel's next port. The local union hall then posts a "job call," and the union members can bid on which jobs they want. The national union then determines which member will fill which position and notifies Waterman. Waterman reviews the member's paperwork, including his licenses and passports, and also requires a physical. If the member's paperwork is in order and he passes the physical, Waterman hires the member for the particular voyage. Waterman can decline to hire a crewmember only under limited circumstances, which do not include residence of the crewmember. Johnston stated that Waterman had to replace the entire crew

of the BUENOS AIRES after Waterman purchased the vessel and that, because the vessel was located in Houston at the time of the purchase, the national unions hired out of Texas union halls.

Cameron also testified that Waterman can hire "permanent employees" for certain positions on its vessels, such as the captain, pursuant to its union contracts. In these circumstances, after the mariner has worked on Waterman vessels, Waterman may offer a permanent position to him. The mariner has the right to decline, and the permanent position must be approved by the union. Cameron testified that the first assistant engineer on board the MAERSK ALABAMA was a permanent employee who resided in Texas.

Employment of 200 Texas resident mariners does not constitute a purposeful contact with Texas. *See Johns Hopkins Univ. v. Nath,* 238 S.W.3d 492, 501 (Tex. App.-Houston [14th Dist.] 2007, pet. denied); *All Star Enter., Inc. v. Buchanan,* 298 S.W.3d 404, 416, 419 n. 12 (Tex.App.-Houston [14th Dist.] 2009, no pet.) (holding that "a third party's choice of residence, whether a royalty-interest owner or an employee, is not conduct by the nonresident corporation directed at the forum state"). Waterman does not require its mariners to live in Texas—those mariners that are Texas residents live here "of their own accord." *See Nath,* 238 S.W.3d at 501. When determining whether a defendant established purposeful contacts with Texas, we consider only the defendant's own actions. *Holten,* 168 S.W.3d at 785. Evidence that Waterman employs Texas residents on its vessels is not sufficient for general jurisdiction because "it demonstrates only the unilateral choices of third parties who have some connection to [the defendant], rather than contacts and conduct by [the defendant]." *See Buchanan,* 298 S.W.3d at 416.

*4. Payment of Texas Franchise Taxes*

▮ Appellees further contend that Waterman's payment of Texas franchise taxes indicates that it does business in Texas and has continuous and systematic contacts with Texas.

Waterman acknowledges that it filed Texas franchise tax returns, but it contends that its franchise tax liability was premised on the number of days Waterman vessels spent in Texas ports per year, and not on revenue received in Texas or from Texas companies. Miguel Estrada, Waterman's Chief Financial Officer, testified in his deposition that Waterman files franchise taxes for every state in which a Waterman vessel goes into port or operates within the state's waters. According to Estrada, stopping in a port to load or unload cargo and traversing the state's waters triggers an "apportionment" for franchise tax liability purposes. Waterman bases its filings on the amount of time spent in Texas ports per year, and Estrada characterized the amounts that Waterman pays as "de minimus" and "immaterial." As examples, Estrada stated that Waterman's Texas franchise tax liability for 2006 was $1400 and the apportionment percentage for 2005 was only 0.7%. Waterman contends that this percentage reflects that Waterman vessels only sporadically called upon Texas ports in 2005. Waterman did not receive any revenue in Texas, nor did it receive any revenue from a Texas company.

▮ Payment of franchise taxes does not automatically establish personal jurisdiction, but only "potentially subjects a foreign corporation to jurisdiction in the state." *Asshauer,* 228 S.W.3d at 933; *Conner v. ContiCarriers & Terminals, Inc.,* 944 S.W.2d 405, 417–18 (Tex.App.-Houston [14th Dist.] 1997, no writ) (plurality op.).

We conclude that Waterman's payment of franchise taxes, which is based solely on the number of days Waterman vessels are in Texas ports per year and does not constitute a significant portion of its tax liability, does not establish general jurisdiction.

### 5. Trips to Texas by Waterman Employees

■ As further evidence that Waterman has "continuous and systematic" contacts with Texas, appellees point to Peter Johnston's trip to Texas to accept delivery of three vessels, "routine trips" to Texas by a port engineer when Waterman vessels need repairs while in Texas ports, and trips to meet with ABS employees in Houston.

Waterman acknowledges that Johnston visited Texas in 2004 to accept delivery of the BUENOS AIRES and the SANTA CRUZ, which were located in Houston at the time Waterman purchased the vessels from a Dutch company. Johnston also testified that he once visited ABS in Houston and that Waterman's port engineers may travel to Texas ports if a vessel located in Texas needs repairs. Other than his own trips, Johnston could not identify specific trips to Texas by Waterman employees. Johnston did not know the frequency with which the port engineer trips occurred, although he disagreed that these trips occurred on a "routine basis." He noted that most issues with ABS are resolved by telephone or e-mail and not by in-person visits to Houston.

■ Occasional travel to Texas is insufficient by itself to establish continuous and systematic contact with the state. See Uche, 264 S.W.3d at 99 (holding that doctor's weekly trips to Texas onboard cruise ship embarking from Galveston were insufficient to constitute continuous and systematic contact); see also Helicopteros, 466 U.S. at 418, 104 S.Ct. at 1874 (holding that trips to Texas for training were "part of the package of goods and services purchased by Helicol from Bell Helicopter" and did not constitute sufficient contacts to support general jurisdiction).

Here, any trips to Texas by port engineers were related to Waterman's purchase of repair and inspection services from ABS and other Texas entities. Johnston traveled to Texas to accept delivery of the BUENOS AIRES and the SANTA CRUZ because the vessels were fortuitously located in Texas at the time Waterman purchased the vessels. See Transportes Aereos de Coahuila, S.A. v. Falcon, 5 S.W.3d 712, 720 (Tex.App.-San Antonio 1999, pet. denied) ("With regard to the few trips that were made by TACSA to retrieve parts and to take delivery of the aircraft, we note that the number of those trips was far less than the trips taken into Texas in the Helicopteros case and far less substantial in nature.... In the instant case, personnel were sent to Texas once to take delivery of the aircraft and infrequently thereafter to purchase supplies, parts and fuel."); cf. Coleman, 83 S.W.3d at 809 (holding that five trips to Texas to attend national conferences did not support general jurisdiction when defendant did not select location of conferences); Reyes, 944 S.W.2d at 404 (holding same for 204 trips to Texas for inspections and reviews required by federal contractual obligations).

We conclude that Waterman employees' trips to Texas were sporadic—such as Johnston's trip to take delivery of the vessels—or part and parcel of Waterman's service contracts with Texas vendors and ABS—the trips by the port engineers. The trips to Texas in the performance of Waterman's contracts with Texas vendors, while a factor weighing in favor of jurisdiction, are not sufficient by themselves to establish general jurisdiction over Water-

man. *See Falcon,* 5 S.W.3d at 720 (comparing trips to Texas in that case—involving delivery of aircraft and purchases of supplies, parts, and fuel—with trips to Texas in *Helicopteros*—training of personnel—where trips did not establish general jurisdiction).

### 6. Waterman's Website

■ Appellees further contend that Waterman maintains an interactive website sufficient to support general jurisdiction, and that Waterman produced no evidence that it only had a passive internet presence.

■ Internet use is characterized as falling within three categories on a sliding scale for purposes of establishing personal jurisdiction. *Choice Auto Brokers, Inc. v. Dawson,* 274 S.W.3d 172, 177–78 (Tex.App.-Houston [1st Dist.] 2008, no pet.); *Michel v. Rocket Eng'g Corp.,* 45 S.W.3d 658, 677 (Tex.App.-Fort Worth 2001, no pet.). At one end of the sliding scale are websites that are "clearly used for transacting business over the Internet," such as entering into contracts, and the knowing and repeated transmission of files of information. *Dawson,* 274 S.W.3d at 177. These websites may be sufficient to establish minimum contacts with a state. *Id.* On the other end of the scale are "passive" or "informational" websites that are used only for purposes such as advertising, and "are not sufficient to establish minimum contacts even though they are accessible to residents of a particular state." *Id.* at 178. Between the extremes of the scale are "interactive" websites that allow for the "exchange of information between a potential customer and a host computer." *Id.* We determine jurisdiction in situations involving an interactive website by examining the degree of interaction between the parties. *Id.; Karstet-*

ter v. Voss, 184 S.W.3d 396, 405 (Tex.App.-Dallas 2006, no pet.).

In *Michel,* the Fort Worth Court of Appeals determined that Rocket's website was "passive" because, although potential customers could contact Rocket via an e-mail link on the website, Rocket could not directly respond over the Internet to the potential customer. *Michel,* 45 S.W.3d at 678 (citing *Mink v. AAAA Dev. LLC.,* 190 F.3d 333, 336 (5th Cir.1999)). Instead, a Rocket sales representative would follow up with the potential customer using the contact information that the customer provided in its e-mail. *Id.; Mink,* 190 F.3d at 337 ("There is no evidence, however, that the website allows AAAA to do anything but reply to e-mail initiated by website visitors."); *see also Buchanan,* 298 S.W.3d at 427 (holding that, although users could submit employment applications, post comments, and subscribe to company's "feed," no evidence existed that company could respond to applications, comments, or inquiries through website, and therefore website was "too passive to establish systematic and continuous contacts"). In *Jackson v. Hoffman,* the Fourteenth Court of Appeals addressed whether a website that provided a phone number, an e-mail address, and a "contact form" constituted an additional contact to be considered in determining jurisdiction. *Jackson,* 312 S.W.3d 146, 154–55 (Tex.App.-Houston [14th Dist.] 2010, no pet.). The court concluded that because there was no evidence regarding whether the host computer could respond to users via the "contact form," the website was merely a "passive form of advertising" and the contact form and contact information were not enough to move the website into the "interactive" category on the sliding scale. *Id.*

When asked in his deposition whether he agreed that Waterman "actively solicits business" from its website, Johnston disa-

greed and stated that Waterman posts information on its website, and that potential customers could read that information and then contact Waterman. Johnston did not believe that customers could contract with Waterman via its website, but, instead, customers could click on a link on the website and send an e-mail to Waterman representatives with any inquiries. There is no evidence regarding how Waterman responds to e-mail inquiries sent to it through its website, such as whether it can respond through the website itself or whether it must follow up via the customer's personal contact information.

The evidence establishes that Waterman's website provides contact information, but does not allow potential customers to book cargo through the website, or enter into contracts through the website. There is no evidence that Waterman can respond to customer inquiries through the website. *See Jackson,* 312 S.W.3d at 154–55 ("Without [evidence of how the host computer responds], we conclude appellee's website is a passive form of advertising."); *Buchanan,* 298 S.W.3d at 427.

We conclude that, like the websites in *Michel, Jackson,* and *Buchanan,* Waterman's website is "passive advertising via the Internet and not a purposeful activity directed toward [Texas] residents." *Michel,* 45 S.W.3d at 678; *see also Jackson,* 312 S.W.3d at 154–55; *Buchanan,* 298 S.W.3d at 427. We therefore do not con-

sider Waterman's website as an additional contact for determining whether general jurisdiction exists.[11]

### 7. Totality of Waterman's Contacts

Although none of Waterman's contacts with Texas, standing alone, is sufficient to establish general jurisdiction, when determining whether Waterman has sufficient minimum contacts to support the exercise of personal jurisdiction, we must investigate, compile, sort, and analyze all contacts "for proof of a pattern of continuing and systematic activity." *See Coleman,* 83 S.W.3d at 809. General jurisdiction requires "a showing of 'substantial activities' within the forum state, and those activities must still be 'purposefully' directed into the forum state." *Michel,* 45 S.W.3d at 680 (quoting *Bearry v. Beech Aircraft Corp.,* 818 F.2d 370, 374 (5th Cir. 1987)). We consider the nature and the quality of Waterman's contacts with Texas, not the "sheer number" of contacts. *Id.* (citing *Guardian Royal,* 815 S.W.2d at 230 n. 1).

When determining whether a defendant's contacts rise to the level of "continuous and systematic" activity necessary to support general jurisdiction, Texas courts often compare the defendant's contacts to those in *Perkins v. Benguet Consolidated Mining Co.,* 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952) and *Helicopteros,* which are on opposite ends of the general juris-

**11.** *Choice Auto Brokers, Inc. v. Dawson,* 274 S.W.3d 172 (Tex.App.-Houston [1st Dist.] 2008, no pet.), involved a website that allowed users to e-mail CAB through the website to schedule test drives and to request additional information, but did not permit users to directly purchase vehicles or contract with CAB. We determined that this website was "interactive," but concluded that we must look to CAB's other contacts with Texas to determine if jurisdiction existed. *Id.* at 178. Dawson suggests that being able to contact the nonresident company through the

website—regardless of how the company is able to respond to the potential customer—is enough to move a website from the "passive" to the "interactive" category. If so, then Waterman's website, which unequivocally allows users to contact Waterman through e-mail links, would be considered "interactive." Because, however, it is also undisputed that users cannot directly contract with Waterman through the website, then this website is merely a factor to consider and we must look to Waterman's other contacts with Texas to determine jurisdiction.

diction spectrum. *See Coleman,* 83 S.W.3d at 809. In *Perkins,* the president and general manager of the defendant company moved his office and company files from the Philippines to Ohio during World War II. 342 U.S. at 448, 72 S.Ct. 413, 96 L.Ed. 485. The president conducted all of the corporation's activities from Ohio, including holding director's meetings, depositing corporate funds into Ohio bank accounts, engaging in corporate correspondence from his Ohio office, using an Ohio office to act as the corporation's transfer agent, and supervising the rehabilitation of Philippines properties from Ohio. *Id.* The Supreme Court concluded that Ohio could exercise general jurisdiction over the corporation because it had, through its president, "been carrying on in Ohio a continuous and systematic, but limited, part of its general business." *Id.* at 438, 72 S.Ct. 413.

In contrast, in *Helicopteros,* the Supreme Court found that Helicol did not have sufficient minimum contacts with Texas, even though its president traveled to Texas and negotiated a contract for transportation in Texas, purchased over $4,000,000 in helicopters and related equipment from Texas vendors "at regular intervals," and sent pilots and personnel to Texas for training. *Helicopteros,* 466 U.S. at 411, 104 S.Ct. at 1868, 104 S.Ct. 1868. Helicol was never authorized to do business in Texas; it did not have a registered agent in Texas; it did not perform helicopter operations in Texas, nor had any of its products ever reached Texas; it did not solicit business in Texas; it did not have any employees based in Texas; it never recruited employees from Texas; it did not own real or personal property in Texas; it did not maintain an office in Texas; and it maintained no records in Texas. *Id.* The Supreme Court concluded that Helicol's contacts with Texas did not "constitute the kind of continuous and systematic general business contacts the Court found to exist in *Perkins.*" *Id.* at 416, 104 S.Ct. at 1873.

When considering the totality of Waterman's contacts with Texas, we conclude that Waterman's contacts are similar to those of Helicol in *Helicopteros.* Although Waterman has made eighteen port calls in Texas, paid Texas vendors approximately $2,000,000 for goods and services, paid franchise taxes, employed Texas residents as mariners through the union hiring policies, and had vessels and barges repaired and inspected in Texas, the majority of these contacts occurred because third-party time-charterers or the federal government directed Waterman vessels to visit Texas ports. Although the quantity of Waterman's contacts with Texas may suggest that Waterman has a significant relationship with Texas, when examining the quality of those contacts, it is clear that Waterman's connection with Texas is sporadic and largely fortuitous. *See Coleman,* 83 S.W.3d at 809–10. Waterman's contacts do not demonstrate that it engages in "substantial activities" that are purposefully directed to Texas. *Michel,* 45 S.W.3d at 680.

Appellees, however, cite the Dallas Court of Appeals' decision in *Siegmund* and the Fourteenth Court of Appeals' decisions in *Buchanan* and *Barker v. Lescroart,* No. 14–06–00125–CV, 2007 WL 445282 (Tex.App.-Houston [14th Dist.] Feb. 13, 2007, no pet.) (mem. op.), in which the courts found that general jurisdiction exists, for the proposition that Waterman has more significant contacts with Texas than each of those three defendants. We conclude that *Siegmund, Buchanan,* and *Barker* are distinguishable.

In *Siegmund,* Siegmund, one of PlaMetCo's three employees, conducted business for the company out of his home in Texas. *Siegmund,* 309 S.W.3d at 707. The Dallas Court of Appeals observed that PlaMet-

Co's business focused on providing "international marketing and management services" to a company called Inppamet, and Siegmund, the "Director International Business Development," was the only employee providing services to Inppamet. *Id.* The Dallas Court concluded that, through Siegmund, PlaMetCo had an "actual physical presence" in Texas, and the activities that Siegmund conducted "continually and systematically" were of "such substantial nature and quality as to justify suit against PlaMetCo in Texas." *Id.* at 708.

Appellees argue that the result in *Siegmund* compels a finding of general jurisdiction over Waterman because, while PlaMetCo only had Siegmund as a resident employee, Waterman employs hundreds of Texas residents, had two Texas residents on board the MAERSK ALABAMA, and appoints port agents to act on its behalf during its Texas port calls.

Unlike in *Siegmund,* Waterman does not maintain any office in Texas, let alone one that conducts a substantial part of its business. Waterman's employment of Texas mariners on board its vessels is merely fortuitous and is the result of the unilateral acts of third parties: (1) those of the national unions, who contact Texas union halls whenever a Waterman vessel needs crewmembers and a Texas port happens to be the next destination and (2) those of the mariners themselves who reside in Texas and respond to union hiring calls. Although Waterman appoints Texas residents to act as port agents, these Texas residents are appointed as port agents only because third-party time-charterers have made a decision to stop at Texas ports. Waterman's special appearance evidence reflects that Waterman vessels only sporadically stop in Texas: eighteen times over a period of nearly seven years.

In *Barker,* Lescroart purchased a large amount of stock from Texas residents, became a director of a Texas corporation, and agreed to provide consulting services for a Texas corporation that required him to travel to Texas to complete his contractual obligations. *Barker,* 2007 WL 445282, at *5. The Fourteenth Court of Appeals held that Lescroart "deliberately created continuing obligations between himself and residents of Texas" and therefore "manifestly availed himself of the privilege of conducting business here." *Id.*

By contrast, Waterman's contracts with Texas vendors to provide goods and services, including repairs and inspections, during the jurisdictional period were limited to times when Waterman vessels called upon Texas ports at the direction of third parties and to "infrequent" contracts with the federal government to load food-aid cargo in Texas. These calls occurred sporadically over the course of nearly seven years. Waterman did not enter into a "continuing" contractual obligation such as Lescroart's agreement to provide consulting services and sit on the board of directors of a Texas corporation. Although Waterman entered into contracts with Texas vendors, mere purchases standing alone, even if done at regular intervals, are not enough to establish general jurisdiction in a cause of action not related to the purchase transactions. *See Helicopteros,* 466 U.S. at 418, 104 S.Ct. at 1874.

Appellees also cite to the Fourteenth Court of Appeals' decision in *Buchanan,* in which the defendant was registered to do business in Texas, had a registered agent in Texas, and had previously had an office in Texas. 298 S.W.3d at 419. Although, as appellees note, Waterman has employed Texas residents as port agents and as mariners, Waterman has never registered to do business in Texas, it does not have a registered agent in Texas, and it has never

had an office in Texas. *Buchanan*, therefore, does not support the exercise of general jurisdiction over Waterman.

We hold that Waterman's special appearance evidence does not establish that Waterman has "continuous and systematic" contacts with Texas such that due process will allow Texas courts to exercise general personal jurisdiction over it.

### C. Maersk's Contacts with Texas

In their third issue, appellees contend that Maersk also has continuous and systematic contacts with Texas sufficient to establish general personal jurisdiction. Because a portion of Maersk's contacts with Texas are of the same nature, although in greater quantity, as the contacts already discussed and analyzed for Waterman, we briefly discuss these contacts first.

### 1. Maersk's Contacts in Common with Waterman

 Like Waterman, Maersk vessels call upon Texas ports at the direction of third-party time-charterers. In his deposition, Michael Hopkins, Maersk's general counsel and Senior Vice President of Contracts and Procurement, testified that Maersk vessels made 612 calls upon Texas ports during the jurisdictional discovery period of nearly seven years, generally calling upon Texas ports twice a week.[12]

According to Hopkins, Maersk was under time charter to its ultimate parent company, A.P. Moller Maersk ("APMM"), for the "majority" of those calls, and APMM directed Maersk vessels to stop in Houston. The remainder of the port calls were made at the direction of the federal government or other shippers. To Hopkins' knowledge, Maersk never made the decision to stop at a Texas port, and Maersk vessels would not have called upon Texas ports had they not been directed to do so by third parties. Port calls, especially those made at the direction of a third party, do not constitute sufficient contacts to establish, by themselves, general jurisdiction. *Uche*, 264 S.W.3d at 100; *Farwah*, 220 S.W.3d at 591–92. However, here the majority of the port calls were made under time-charter to Maersk's own parent company, not an independent third party. Moreover, the evidence establishes that over 600 calls were made by Maersk at such direction during the jurisdictional period, generally on a routine two-week basis.

Maersk also entered into contracts with Texas vendors for goods and services while its vessels were located in Texas ports. During the jurisdictional discovery period, Maersk paid $145,066,543.53 to Texas vendors, including payments for repairs and maintenance to Maersk vessels made while in Texas ports.[13] Purchases of goods and

---

**12.** Cronan's counsel asked Hopkins whether Maersk vessels call upon Houston twice a week. Hopkins replied that he was not sure, and "[he thought] so, but, you know, there could be weeks when we don't call." Cronan's counsel asked Dennis Houghton, Maersk's Marine Personnel Director, whether Maersk vessels make regular calls upon Texas ports, and Houghton responded that he did not know what counsel meant by "regular calls" and that the vessels, "depending on the cargo that is booked for the vessel," go to the particular port to load the cargo.

**13.** Appellees contend that Maersk "pays $50,-000–$75,000 per day to Texas vendors for goods/services that were provided/performed solely in Texas, for a total of more than $370 million between January 2003 and October 2009." To arrive at this figure, appellees appear to have taken the total amount Maersk paid to Texas vendors and then divided that amount by the number of days between January 1, 2003 and October 6, 2009. The $370 million total amount also includes a $227,000,000 payment that Maersk made to its immediate parent company as a "short-

services, however, even if occurring regularly, are insufficient by themselves to warrant the exercise of personal jurisdiction over the nonresident defendant when the purchases do not relate to the cause of action. *See Helicopteros*, 466 U.S. at 418, 104 S.Ct. at 1874; *Reyes*, 944 S.W.2d at 403, 404 (finding no general jurisdiction over defendant who purchased more than $183,000,000 in goods from at least 471 Texas residents and companies).

Maersk also employed 627 Texas resident mariners. Dennis Houghton, Maersk's Marine Personnel Director, testified that, to provide a crew for Maersk vessels, Maersk uses the same procedure that Waterman does: Maersk contacts the national union, which then contacts the local union halls and allows mariners to bid on the job they want. The unions select the mariners, and Maersk may reject a mariner only in limited circumstances. Houghton also testified that, occasionally, if a Maersk vessel is calling on a Texas port and it needs a crewmember immediately, it contacts the local union hall directly before contacting the national union office to give the local office a "heads up" that a crewmember is needed. According to Houghton, Maersk contacted the local hall for this purpose "sporadically," or about two or three times per year. The state of residency of Maersk's mariners is not a purposeful contact by Maersk directed toward Texas—Maersk does not control the states in which the mariners reside, nor does it control who the national union selects to fill the open position. *See Nath*, 238 S.W.3d at 501; *Buchanan*, 298 S.W.3d at 416, 419 n. 12. Furthermore, Maersk's occasional direct contacting of a Texas un-

ion hall to immediately replace a crewmember is fortuitous, and depends upon where the vessel is located and the nearest port relative to the vessel's location at the time the need to replace the crewmember arises. We conclude that Maersk does not purposefully direct its hiring and employment activities towards Texas residents. This does not constitute an act purposefully directed toward Texas.

Maersk also paid Texas franchise taxes for 2003–2009. Steve Hadder, Maersk's Vice President of Finance, testified in his deposition that Maersk's franchise tax liability is calculated by determining the number of days each Maersk vessel is in a Texas port, divided by the number of days in the year. This amount is then multiplied by the "chartering revenue" for the vessel, which equals the percentage of revenue for that vessel apportioned to Texas. Maersk calculates this amount for each vessel and adds together the amounts for all vessels that call upon Texas ports to equal its total franchise tax liability for the year in Texas. Maersk paid $35,603.39 in Texas franchise taxes in 2006. Although the record does not include Maersk's franchise tax returns for 2003–2005, Hadder testified that Maersk paid less than $20,000 in Texas franchise taxes for each of these three years.[14] Again, franchise tax liability, standing alone, does not establish general jurisdiction. *Asshauer*, 228 S.W.3d at 933; *Conner*, 944 S.W.2d at 417–18.

During the jurisdictional discovery period, from 2003 to 2009, seven Maersk employees traveled to Texas. Dennis Houghton testified that he made four or five trips to the Texas A & M Maritime School in

---

term loan ... for cash management purposes."

**14.** Beginning in 2007, Maersk, Inc., Maersk's immediate parent company, paid franchise taxes for Maersk and its other subsidiaries.

Steve Hadder testified that, eventually, Maersk, Inc. would require Maersk to pay back its share, although it had not so required as of the date of Hadder's deposition.

Galveston to attend a "career fair" and to familiarize cadets with Maersk.[15] On one of these occasions, Houghton also traveled to Houston to meet with the port agent of the Houston Seafarers' International Union hall. Kevin Speers, Maersk's Senior Director of Marketing and Administration, testified that he traveled to Houston with at least three other Maersk employees for a business meeting with APMM, in which the company representatives discussed how to improve its services to the United States military. Michael Hopkins testified that he also traveled to Houston once on Maersk business, for an "industry meeting called by the federal government." Occasional travel to Texas is, standing alone, insufficient to establish general jurisdiction. *Uche,* 264 S.W.3d at 99. Moreover, the Maersk employees traveling to Texas did not choose the locations of the meetings and events that they were attending, which reduces the significance of the contacts. *See Coleman,* 83 S.W.3d at 809 (holding that five trips to Texas to attend national conferences did not support general jurisdiction when defendant did not select location of conferences); *Reyes,* 944 S.W.2d at 404 (holding same for 204 trips to Texas for inspections and reviews required by federal contractual obligations).

### 2. Maersk's Website

Appellees contend that Maersk maintains an interactive website which has a feature for prospective Maersk employees, allows "eSuppliers" and vendors to log in and do business with Maersk, and, through links to APMM's website, advertises Maersk vessels regularly calling on Houston.

Kevin Speers testified that a section of Maersk's website is devoted to prospective employees, and, for mariners, the website

informs the potential employee that to become a crewmember on a Maersk vessel he must first become a member of a union. The website provides links to the unions with which Maersk contracts. Speers also testified that Maersk's website is "informational," and it directs potential customers to other websites within the APMM family of companies, where they can transact business and purchase services. Potential customers cannot enter into contracts with Maersk through Maersk's website, although Speers acknowledged that Maersk's website links to APMM's, where the customers can find out more information regarding shipping with Maersk. Speers also stated that interested customers have to visit APMM's website to find information regarding Maersk's vessel schedules, as that information is not located on Maersk's website.

During his deposition, Speers also discussed a section of the Maersk website for "eSuppliers" and vendors. This section allows suppliers and vendors of Maersk, not customers, to register and log in to access information. The eSupplier page includes the following statement: "This portal has been designed to serve our suppliers by providing a centralized location for information that will assist you in conducting business with us." Speers testified that this section of the website is only for "previously registered" suppliers and vendors selling goods or services to Maersk and does not pertain to Maersk's selling its transportation services to customers. The record does not contain any evidence regarding the contents of the eSupplier portal, the types of information that suppliers and Maersk can exchange within this portal, or the methods by which suppliers and Maersk can exchange information through the website. The record

---

15. Houghton's trips to Texas for the A & M career fair are discussed in greater depth in the separate section regarding solicitation of employment.

also does not contain evidence regarding whether suppliers and vendors can enter into contracts with Maersk over its website, although Speers' statement that the eSupplier portal is for "previously registered" suppliers suggests that this section of the website is for suppliers and vendors that have a pre-existing relationship with Maersk and that the website does not provide a means for companies seeking to become suppliers to enter into a contractual relationship with Maersk. Maersk customers cannot book cargo through the website, and the site, in Speers' opinion, "has been and continues to be an informational website."

Internet usage is characterized along a sliding scale. *Dawson,* 274 S.W.3d at 177. We classify a website as "interactive" for the purpose of transactions of goods or services if it allows for the exchange of information between potential customers and the host. *Id.* at 178. Although the evidence reflects that customers seeking to use Maersk vessels to ship cargo cannot enter into contracts with Maersk through its website and there is no indication that suppliers and vendors can initially enter into contracts with Maersk through its website, the website does allow registered suppliers and vendors to log into a special section of the website to "assist [the suppliers] in conducting business with [Maersk.]" We conclude that Maersk's website is interactive. *See Daimler–Benz Aktiengesellschaft v. Olson,* 21 S.W.3d 707, 724–25 (Tex.App.-Austin 2000, pet. dism'd w.o.j.) (classifying website as "interactive" where site allowed users to submit comments and questions and allowed users to sign up for electronic mailing service but referred vehicle sales to parent company). Although this level of interactivity is, standing alone, not enough to subject Maersk to jurisdiction in Texas, we consider it as a factor, along with Maersk's other

Texas contacts. *Id.; Dawson,* 274 S.W.3d at 178.

### 3. Registered to do Business, Registered Agent, and Permanent Employee in Texas

Maersk concedes that it is registered to do business in Texas and maintains a registered agent for service of process in Texas; however, it contends that these contacts are not sufficient to support general jurisdiction.

When a foreign corporation registers to do business in Texas, it "only potentially subjects itself to jurisdiction" in Texas. *Conner,* 944 S.W.2d at 416. Although we consider registering to do business in Texas and maintaining a registered agent in Texas in undertaking a minimum contacts analysis, these factors are not dispositive of whether Texas courts can constitutionally exercise general jurisdiction. *See Buchanan,* 298 S.W.3d at 419.

Maersk also concedes that it has a full-time employee in Houston, who works out of his home, uses an "unlisted company cellphone for his job duties," and acts as a port agent whenever Maersk vessels call at Texas ports. Maersk provides health benefits to this employee and this employee is covered under Maersk's workers' compensation insurance. In his affidavit supporting Maersk's special appearance, Hopkins averred that Maersk "does not solicit business in Texas through this single employee and [Maersk] does not hold itself out as being open for general business in Texas through this single employee." This employee's duties are limited to "interface[ing] between the vessel and the shoreside support."

Having an office or a physical presence in the forum state "does not require a finding of general jurisdiction." *Alenia Spazio, S.p.A. v. Reid,* 130 S.W.3d

201, 217 (Tex.App.-Houston [14th Dist.] 2003, pet. denied). The significance of the contact "depends on the type and nature of the office maintained." *Id.* For example, if the office is a permanent general business office through which the company solicits business in Texas, this factor weighs strongly in favor of general jurisdiction. *Id.; see also Siegmund,* 309 S.W.3d at 707–08 (finding general jurisdiction when one Texas employee used home as "base of operations" for conducting substantial business for company).

Maersk does not maintain a "general business office" in Texas, but instead employs one employee whose duties are limited to acting as a port agent when a Maersk vessel calls upon a Texas port. This employee conducts Maersk's business in Texas. Although the continuous presence of an employee in Texas is a factor we consider, that factor alone does not support a finding of general jurisdiction. *See Siegmund,* 309 S.W.3d at 707–08; *Alenia Spazio,* 130 S.W.3d at 217.

### *4. Solicitation of Employees at A & M Career Fair*

Dennis Houghton, Maersk's Marine Personnel Director, testified that he traveled to Texas four or five times to attend a career fair at the Texas A & M Maritime School in Galveston during the jurisdictional period. At this fair, he presented information about Maersk to interested cadets and "familiarized" them with the company and "the unions that they have to join to be able to sail on [Maersk's] vessels." He stated that, although he accepts resumes from the cadets if they give him one and answers e-mail inquiries about working for Maersk, he does not follow up with the cadets about future employment with Maersk. Houghton acknowledged that, occasionally, a cadet he spoke to at A & M could later be employed on a Maersk vessel, although Houghton emphasized that Maersk would have had nothing to do with that placement and that a former A & M cadet may work on Maersk vessels only if the cadet bids on the job and the union selects him for the position. Houghton also testified that A & M cadets can work on Maersk vessels while still in maritime school under the federal Maritime Subsidy Program. Houghton stated that accepting cadets onto Maersk ships is required under the program and that Maersk cannot pick students from a particular school to gain experience on its vessels through the program.

Maersk contends that when Houghton visited the career fair, the purpose of the visit "was not to solicit and hire cadets to work" for Maersk, but was to "familiarize the cadets at the Maritime School with [Maersk] and provide information to the cadets." We disagree with Maersk's contention that it did not solicit future employees at the career fairs. Although Maersk correctly notes that, pursuant to union protocols, it could not directly hire an interested cadet at the career fair for an immediate position on a vessel, the purpose of Houghton's visits was to inform the cadets of the benefits of working on Maersk vessels so that, in the future, they would be more likely to bid on open mariner positions on Maersk vessels. The A & M career fair is held yearly, and Houghton agreed that he attended the fair "four or five times in the last four or five years." Houghton's visits to the A & M career fair are a regularly conducted activity that specifically targets Texas residents. *See Buchanan,* 298 S.W.3d at 427 (holding website not interactive because, although it invites prospective employees to submit applications, Texas residents were not "targeted for recruitment"). His visits to the career fair to solicit and recruit future employees for Maersk may be considered as a factor that supports jurisdiction.

### 5. Texas Bank Accounts

Appellees contend that Maersk deposited approximately $227,000,000 into the Dallas bank account of its immediate parent company, Maersk, Inc., and maintained eight separate Bank of America accounts in San Antonio for specific Maersk vessels.

Whether a defendant possesses a bank account in Texas is a factor that we consider when determining whether the defendant is subject to general jurisdiction. *See El Puerto de Liverpool, S.A. de C.V. v. Servi Mundo Llantero S.A. de C.V.*, 82 S.W.3d 622, 631 (Tex.App.-Corpus Christi 2002, pet. dism'd w.o.j.) (citing *CSR*, 925 S.W.2d at 595); *Transportacion Especial Autorizada, S.A. de C.V. v. Seguros Comercial Am., S.A. de C.V.*, 978 S.W.2d 716, 720 (Tex.App.-Austin 1998, no pet.). In determining jurisdiction, we focus on the quality and nature of the defendant's contacts with Texas, and, therefore, use of the bank account "must be continuous and systematic in order to support the exercise of general jurisdiction." *El Puerto*, 82 S.W.3d at 631; *Falcon*, 5 S.W.3d at 720 ("The infrequent use of the Laredo National Bank account to assist in the sporadic purchases is similarly unavailing."). The total number of funds in the account and the number of transactions involving the account are not, by themselves, determinative of jurisdiction. *El Puerto*, 82 S.W.3d at 631 (citing *Primera Vista v. Banca Serfin*, 974 S.W.2d 918, 926 (Tex.App.-El Paso 1998, no pet.)). Mere "pass-through" accounts, "where the account merely serves as a conduit for funds in transit, will not by itself result in general jurisdiction." *Id.*

Here, Maersk contends that it loaned approximately $227,000,000 in excess operating funds to Maersk, Inc., its New Jersey parent company, as part of a "cash management" program set up by Maersk, Inc. for its subsidiary companies and that

Bank of America processed the loans through its Dallas branch. Steve Hadder testified that Maersk does not intend to do business with a bank located in Texas, and if funds intended for Maersk's parent company passed through a Texas branch, "[t]hat's simply a Bank of America structure." Hadder stated that Maersk has never directed any bank to open an account in Texas, but he was not sure if Maersk, Inc. owned any bank accounts in Texas. The record is unclear regarding whether this account was located in Texas or whether the account was located in New Jersey and Bank of America merely processed the funds through its Dallas branch. Regardless, it is undisputed that these deposits were made into an account owned by Maersk, Inc., the parent company, and not Maersk Line, Limited, the defendant in this case.

Even if the account is located in Texas, appellees make no argument and cite no authority for the proposition that this account owned by the parent company should be a Texas contact imputed to the subsidiary company. *See Helicopteros*, 466 U.S. at 416–17, 104 S.Ct. at 1873 (noting that Helicol's acceptance of check drawn on Texas bank was not purposeful because choice of bank was within discretion of drawer, not payee); *Moni Pulo Ltd. v. Trutec Oil & Gas, Inc.*, 130 S.W.3d 170, 177–78 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (holding Texas bank accounts not sufficient to establish general jurisdiction when defendant, although beneficiary of accounts, had no control over accounts or their location); *Preussag Aktiengesellschaft v. Coleman*, 16 S.W.3d 110, 124 (Tex.App.-Houston [1st Dist.] 2000, pet. dism'd w.o.j) ("The fact that Preussag AG deposits its funds under this system in some subsidiaries' Texas bank accounts is a fortuitous contact, since the 'banking' system is not itself directed toward Tex-

as."); *see also Conner*, 944 S.W.2d at 419 ("If parent and subsidiary maintain separate and distinct corporate entities, the presence of one corporation in a forum state may not be attributed to the other.").

■ In its "Second Supplemental Memorandum" supporting its special appearance, Maersk agreed that it opened eight "vessel specific" bank accounts with Bank of America to "receive payments for military vessel operations," but it asserted that Bank of America unilaterally decided to process the accounts through the Military Bank Overseas Division located in San Antonio and that Maersk did not purposefully choose to open the accounts in Texas. In its briefing to this Court, Maersk acknowledges that the eight accounts were located in Texas but contends that these accounts "were temporary and have been closed." Aside from the brief mention of these accounts in Maersk's Second Supplemental Memorandum, the record contains no evidence regarding these accounts, such as the amount of funds contained in the accounts or the number and frequency of transactions involving the accounts.

■ In assessing a defendant's minimum contacts when the defendant possesses a bank account in Texas, we focus on the quality of the defendant's use of the account, whether the defendant purposefully availed itself of the privileges and benefits of conducting business in Texas, and whether the defendant's use of the account constituted "substantial activities" in Texas. *El Puerto*, 82 S.W.3d at 632. In *El Puerto*, two corporate officers testified that the company's Texas bank account was used "for the purpose of the company's business" and "to provide dollars for the company's operating needs." *Id.* The record reflected that El Puerto used the account continuously for a five year period and completed "numerous and repeated" transactions involving the account. *Id.* at 633. Testimony also indicated that El Puerto specifically chose to open the account in Texas and that El Puerto used the account to "directly facilitate its own business" and for "substantive transactions." *Id.* The Corpus Christi Court of Appeals concluded that El Puerto conducted substantial activities in Texas through its bank account. *Id.*

Here, in contrast, the record contains no evidence regarding the amount of funds placed in these eight accounts, the number of transactions involving the accounts, or how Maersk used the accounts. Based on this record, we cannot conclude that Maersk used the accounts continuously and systematically and conducted "substantial activities" in Texas through the accounts. We therefore consider these accounts as a factor weighing in favor of jurisdiction, but we note that the accounts alone are not sufficient to establish general jurisdiction. *Id.*

### 6. Payments Received from Texas Entities

■ Maersk received approximately $7,500,000 from Azure Shipping Company, S.A., a Panamanian company, to ship three loads of cargo from Georgia to Angola. Azure's agent, American Shipping & Chartering ("ASC"), is a Texas company. Hopkins, Maersk's general counsel, testified that Maersk picked up the cargo in Georgia, no Maersk employee traveled to Texas to enter into the contract, and Maersk did not receive payment from ASC, the Texas agent. Maersk also received an additional payment of approximately $160,000 from ASC on behalf of Azure for another shipment of goods. Because Maersk had no control over the citizenship of Azure's agent, we conclude that the only connection to Texas in these transactions is too

remote and fortuitous to support the exercise of general jurisdiction.

Maersk also sold $530,000 worth of "excess consumables" located on six different Maersk vessels to Ocean Shipholdings, Inc., a Texas company. Hadder testified that Maersk had a contract with Military Sealift Command, and, at the end of that contract, Maersk sold the non-government-owned excess property and equipment on the ship to the next operator, which was a Texas company. Hadder stated that the $530,000 Maersk received "[was] not considered revenue for accounting purposes."

■■■ Isolated sales to Texas residents do not constitute purposeful availment of the benefits and protection of Texas laws. Therefore, this sale does not invoke general jurisdiction. *Reyes,* 944 S.W.2d at 405.

### 7. Contract with Telemar

Maersk contracted with Telemar USA, LLC, a Texas company, to provide maintenance and repair services for telecommunications, radio, and navigation systems on Maersk ships throughout the world, with no restrictions on the ports in which Telemar is to provide its services. Appellees contend that Maersk contractually reserved the right to sue in Texas courts pursuant to the following clause in the contract with Telemar:

> This Agreement shall be governed by and construed in accordance with the laws of the State of Virginia. The parties submit to the exclusive jurisdiction of the courts of Virginia, provided that the OWNER [Maersk] but not the Company shall also be entitled to commence proceedings in relation to this agreement in the courts of such other jurisdiction where the vessel or any item to which this Agreement relates may be.

This clause provided for use of Virginia law in construing the contract and the parties agreed to submit to jurisdiction in Virginia. However, Maersk retained the right to sue in the courts of the jurisdiction in which the vessel or any other item covered under the contract was located, which could be Texas.

■■■ Maersk has not sued Telemar on this contract, and, even if it had, voluntarily filing suit in a particular jurisdiction is purposeful availment of the jurisdiction's facilities and can subject the party to personal jurisdiction in another lawsuit "only when the lawsuits arise from the same general transaction." *Zamarron v. Shinko Wire Co.,* 125 S.W.3d 132, 143 (Tex. App.-Houston [14th Dist.] 2003, pet. denied). Although Maersk retained the right to sue Telemar in Texas when its vessels or any item related to its contract with Telemar were in Texas, this reservation of rights in a contract with a Texas company for the provision of services does not establish general jurisdiction in this case. The Telemar contract bears no relation to the facts of this lawsuit and is not part of the "same general transaction." *See id.*

### 8. Previous Lawsuits in Texas

Michael Hopkins testified that, during his tenure with the company, Maersk had been sued twice in Texas before this case.[16] Hopkins testified that Maersk did not challenge personal jurisdiction in these previous lawsuits.

■■■ The failure of a defendant to challenge personal jurisdiction in a case in which a Texas court apparently would be able to exercise specific jurisdiction "does not demonstrate that a nonresident defendant has the continuous and systematic contacts with Texas necessary for the ex-

---

**16.** Hopkins testified that Maersk has been sued by Flanagan Stevedoring Company and Commodity Solutions, LLC for failure to pay for services rendered.

ercise of general jurisdiction." *Buchanan,* 298 S.W.3d at 414 (citing *Nath,* 238 S.W.3d at 501). The previous lawsuits against Maersk, which involved allegations that Maersk failed to pay for services rendered, could have been subject to specific jurisdiction, in which case, Maersk's failure to specially appear in those case does not establish that Maersk has the continuous and systematic contacts with Texas necessary to establish general jurisdiction in this case. *See id.*

### 9. Advertising Texas Port Calls

At the special appearance hearing, the trial court admitted printouts from Maersk's website depicting a "historical list of its routes."[17] This exhibit consists of Maersk's "North American Service Guide," dated 2009, which describes the services that Maersk offers to five general areas of the world: Africa, Central America, the Mediterranean, the Middle East and the Indian Subcontinent, and Northern Europe. According to the Service Guide, ten routes from East and West Africa stop in Houston, ten routes total from the Mediterranean, Middle East, and Indian Subcontinent stop in Houston, four routes from Central America stop in Houston, and three routes from Northern Europe stop in Houston.

The Service Guide informs potential customers seeking to ship to and from Central America that Maersk's service portfolio provides "a wide number of options with direct departures to the U.S. East, West and Gulf Coasts." The Guide states that Maersk's "Expreso" service has "a fast transit time to Houston from Central American ports" and that the service "con-tinues direct calls to New Orleans and Houston" catering to Central American origins. Similarly, the guide promises that "[d]irect, reliable service, and best-in-industry transit times are available from Italy and Spain to all major U.S. East Coast ports and Houston" and states that "MECL2 offers dedicated mother vessel service from Port Said westbound to the U.S. East Coast and Houston." The Service Guide also advertises "[w]eekly U.S. Flag service on the TA2 with new, faster vessels [that] provides a dedicated service from Northern Europe to Charleston, Houston and now Mobile." Kevin Speers, Maersk's Marketing Director, testified that, at trade shows, Maersk representatives talk about the foreign and domestic ports that they can serve, including Houston, that Maersk's marketing materials include vessel routes and maps of port calls, and that the materials advertise that Maersk's vessels call on Houston. *Cf. Conner,* 944 S.W.2d at 417 ("Texas is *never* the original destination of ContiCarriers' barges, and barge loads only go to Texas upon *customer request.* ContiCarriers has never made a conscious effort to secure freight to go to Texas, and often refuses customer requests to take barges to Texas because it does not 'do business' in the state and has nothing to back-haul.") (emphasis in original).

At the special appearance hearing, the trial court also admitted, without objection, a copy of Maersk's Twitter feed, dating from June 5, 2009, which provides information on Maersk's Breakbulk Vessel Schedule. Maersk provides regular updates for the "estimated time of arrival" for six dif-

---

**17.** Maersk objected on the ground that the printouts indicated that appellees printed the documents on April 19, 2010, and the relevant time period for determining Maersk's contacts with Texas ended on October 6, 2009, the date Ruiz filed suit. Maersk does not complain on appeal about the trial court's ruling admitting this evidence, nor does Maersk contend that the routes depicted in its "North American Service Guide," dated 2009, were any different before the jurisdictional discovery cut-off date.

ferent Maersk vessels at various ports. Almost all of the updates include "ETAs" for the Port of Houston. Maersk also uses its Twitter feed to promote the capabilities of its vessels, such as by stating that the "Maersk Constellation is a geared multi-purpose vessel offering 30,000 square feet of Ro/Ro capability[,] LOA 182m, DWT 29750mt, bale 35489cbm." On two occasions before the jurisdictional discovery cut-off of October 6, 2009, Maersk used its Twitter feed to solicit additional cargo for its voyages. On June 16, 2009, Maersk posted that it was "soliciting U.S. flag and [commercial] cargo [loading] on the U.S. East Coast (USEC) and U.S. Gulf (USG) for [discharge in] Northern Europe, [Mediterranean,] and Black Sea." Maersk posted a similar message on June 30, 2009, seeking flag or commercial cargo for discharge in the Mediterranean, Red Sea, Black Sea, or East Africa, departing from ports on the East and Gulf Coasts.

This evidence indicates that Houston is a "regular" port for Maersk and is part of its established service routes. Maersk advertises that it calls on Houston on a regular basis, praises its "best-in-industry transit times" to United States ports, including Houston, and solicits additional cargo via Twitter when its vessels located in Gulf of Mexico ports, including Houston, have extra storage space.

### 10. Totality of Maersk's Contents with Texas

■ Even if a defendant's contacts with Texas, when considered in isolation, may not be sufficient to establish personal jurisdiction, we consider all contacts together when determining if the defendant has sufficient minimum contacts to support general jurisdiction. *Coleman*, 83 S.W.3d at 809. Although Maersk has several categories of contacts in common with Waterman, such as employing Texas residents as mariners through the national unions and paying Texas vendors when its ships call upon Texas ports, Maersk has numerous additional contacts that, when considered together, indicate that Maersk is engaged in substantial activities purposefully directed to Texas. *Michel*, 45 S.W.3d at 680.

Maersk is registered to do business in Texas, it maintains a registered agent for service of process in Texas, and it has a full-time employee in Houston to act as a port agent when Maersk vessels call upon the Port of Houston. Although this employee's activities do not constitute a significant portion of Maersk's overall business, the fact that Maersk retains an employee on a full-time basis to handle its vessels calling on Houston, as opposed to hiring an agent on an ad hoc basis like Waterman, reflects the frequency with which Maersk vessels call on Texas ports and suggests that Maersk derives enough business from its voyages to Texas to justify this position. Furthermore, Maersk advertises, through the North American Service Guide available on its website, its marketing materials and trade show publications, and its Twitter feed, that its vessels regularly call on the Port of Houston and that Houston is a stop on numerous established service routes. Maersk vessels frequently visit Texas and Maersk holds itself out as calling on Houston on a regular basis. Maersk also, on at least two occasions during the relevant period, solicited additional cargo for its vessels, to load in ports on the East and Gulf coasts of the United States. Maersk does business with Texas entities, pays Texas franchise taxes, maintained eight bank accounts in Texas, has an interactive website, solicits future employees at the Texas A & M career fair, and has, on one occasion, contractually reserved the right to sue a Texas company in Texas.

When we consider the totality of Maersk's contacts with Texas, we conclude that Maersk has purposefully availed itself of the benefits and protections of Texas laws and has established sufficient minimum contacts with Texas to support the exercise of general jurisdiction.

## Fair Play and Substantial Justice

Having determined that Maersk purposefully established minimum contacts with Texas, we must now determine whether the exercise of personal jurisdiction over it comports with traditional notions of fair play and substantial justice. *See Glattly,* 177 S.W.3d at 447 (citing *Burger King,* 471 U.S. at 475–76, 105 S.Ct. at 2183–84). When making this inquiry, we consider: (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental, substantive social policies. *Guardian Royal,* 815 S.W.2d at 231. Only in rare cases will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state. *Spir Star AG v. Kimich,* 310 S.W.3d 868, 878 (Tex.2010). To defeat jurisdiction, Maersk must present "a compelling case that the presence of some consideration would render jurisdiction unreasonable." *Id.* (quoting *Guardian Royal,* 815 S.W.2d at 231).

When a Texas resident pursues a cause of action for harm committed within Texas, "the fairness considerations have little impact." *Michel,* 45 S.W.3d at 683. When, however, the cause of action is not connected to Texas and none of the parties are Texas residents, "fairness becomes of paramount importance." *Id.* (citing *Jones v. J.P. Sauer & Sohn,* 27 S.W.3d 157, 161 (Tex.App.-San Antonio 2000, pet. denied)).

Maersk contends that the burden on it to defend the case in Texas would be great because Maersk has no office in Texas, but is instead headquartered in Virginia, and a trial with ten plaintiffs and intervenors would be lengthy and would "consum[e] enormous resources." Distance alone is insufficient to defeat jurisdiction, because "[m]odern transportation and communication make it much less burdensome for a party to defend itself in a state where it does business." *Spir Star,* 310 S.W.3d at 879; *State of Rio de Janeiro v. Philip Morris, Inc.,* 143 S.W.3d 497, 502 (Tex.App.-Beaumont 2004, pet. denied). Maersk's contacts with Texas lessen the burden of defending the lawsuit. *Philip Morris,* 143 S.W.3d at 502 (citing *Olson,* 21 S.W.3d at 726).

The record indicates that Maersk employees have traveled to Texas before, that Maersk admits it has participated in lawsuits in Texas on previous occasions, and that Maersk contractually reserved the right to sue in Texas for matters relating to its contract with Telemar. *See Buchanan,* 298 S.W.3d at 420 ("The record instead demonstrates that Antero employees already travel to Texas for business meetings, and Antero has been represented by Texas attorneys throughout its existence, both in this litigation and for corporate legal advice."); *see also Villagomez v. Rockwood Specialties, Inc.,* 210 S.W.3d 720, 743 (Tex.App.-Corpus Christi 2006, pet. denied) ("As a national corporation with ongoing and pervasive contacts with Texas, Rockwood is especially well suited for this type of out-of-state litigation."). Furthermore, unlike Rocket Engineering in *Michel,* Maersk is not a "small enterprise." *See Michel,* 45 S.W.3d at 683–84.

The burden on Maersk of defending this lawsuit in Texas is minimal and does not, by itself, preclude the exercise of jurisdiction. *Philip Morris,* 143 S.W.3d at 502.

■■■ Maersk contends that the remaining factors weigh against exercising personal jurisdiction in Texas because Texas has no connection to this lawsuit: the underlying incident occurred off the coast of Somalia, none of the plaintiffs reside in Texas so Texas has no interest in obtaining redress for its citizens, Maersk is a Delaware corporation with its principal place of business in Virginia, Maersk's employees and representatives all reside in Virginia, none of the witnesses reside in Texas, none of the relevant evidence exists in Texas, and Texas has no property interest at stake in this litigation. *Id.; James v. Ill. Cent. R.R. Co.,* 965 S.W.2d 594, 599 (Tex.App.-Houston [1st Dist.] 1998, no pet.) ("The cause of action did not occur in Texas, and neither party is a resident of this state.").

Generally, Texas has no interest in adjudicating a case between nonresidents concerning occurrences that took place outside of Texas. *Moni Pulo,* 130 S.W.3d at 180 (holding, in dicta, that exercising personal jurisdiction violated traditional notions of fair play and substantial justice). In *James,* we held that, although Illinois Central had sufficient minimum contacts with Texas, Texas had no interest in adjudicating the particular dispute. *James,* 965 S.W.2d at 599. The underlying suit was for personal injuries suffered by James as he worked as a switchman for Illinois Central in Tennessee. *Id.* at 596. Illinois Central's "only conduct in Texas" involved its employment of an accounts manager as a full-time employee in Houston. *Id.* at 598, 599 n. 3. We concluded that Texas's interest in adjudicating the dispute was "further diminished because James's injury has no relation to Illinois

Central's activities in Texas." *Id.* at 599. In that case, by exercising personal jurisdiction, Texas "would not be protecting its citizens from the potential future actions of Illinois Central." *Id.; see also Verizon Cal. Inc. v. Douglas,* No. 01–05–00707–CV, 2006 WL 490888, at *7 (Tex.App.-Houston [1st Dist.] Mar. 2, 2006, no pet.) (mem. op.) ("The parties are California residents; thus, Texas has no interest either in protecting its citizens or in policing the activities of a corporation authorized to do business in the state.").

Here, although none of the current parties to this litigation are residents of Texas, two of the crewmembers on board the MAERSK ALABAMA were Texas residents, and Maersk has employed over 600 Texas resident mariners throughout the past eight years. In the underlying lawsuit, the appellees allege that Maersk was negligent and grossly negligent by providing inadequate security and safety for the crewmembers and that Maersk knowingly sent its vessels into unsafe waters. This case directly implicates Maersk's safety practices, which would affect the Texas mariners sailing on Maersk vessels. Thus, unlike in *James,* by exercising jurisdiction over Maersk here, Texas could "protect its citizens from the potential future actions" of Maersk.

The third factor to consider is the plaintiff's interest in obtaining convenient and effective relief. Although none of the plaintiffs and intervenors are Texas residents, they chose Texas as their forum. In this situation, "we can presume they do not find [litigating in Texas to be] inconvenient or ineffective." *E.I. DuPont de Nemours & Co. v. Bailey,* 986 S.W.2d 82, 84–85 (Tex.App.-Beaumont 1999, pet. dism'd w.o.j.); *Solow v. Century Assets Corp.,* 12 S.W.3d 512, 517 (Tex.App.-Beaumont 1999, no pet.) ("Destefano chose Texas as his forum; we cannot presume he

finds it inconvenient or ineffective."); *see also Glencoe Capital Partners II, LP v. Gernsbacher,* 269 S.W.3d 157, 168 (Tex. App.-Fort Worth 2008, no pet.) ("[B]ecause Appellants hail from several different states, there will be some degree of inconvenience on at least some of them regardless of where litigation proceeds."). It may, as Maersk contends, be "more convenient" for the plaintiffs to litigate in a different forum, such as one in which the majority of parties reside; however, whether a particular forum is more or less convenient is a question for a forum non conveniens case, not a special appearance. *Bailey,* 986 S.W.2d at 85. Merely because it might be most efficient to litigate where the majority of witnesses and evidence is likely to be located does not establish that it would be inefficient to litigate in Texas. *See id.* ("Further, as noted in our discussion under the burdensome factor, the record contains no evidence of where the witnesses are located."). Although Maersk's corporate representatives and employees reside in Virginia and the appellees reside in New York, Pennsylvania, and Florida, the record contains no evidence of where other witnesses, such as appellees' medical experts, reside.

When considering the interstate judicial system's interest in obtaining the most efficient resolution of the controversy as well as the "shared interest of the several states" in furthering fundamental social policies, we must weigh the interests of Texas, Virginia, New York, Pennsylvania, and Florida. *Michel,* 45 S.W.3d at 684. Virginia, as the "home state" of Maersk, arguably has the greater interest in the substantive social policies relating to the conduct of one of its residents. *See id.; Philip Morris,* 143 S.W.3d at 503 (holding that state in which defendant has principal place of business has direct interest in substantive law relating to dispute and strong interest in governing conduct of its

residents). This factor, therefore, weighs in favor of not exercising jurisdiction in Texas.

Decisions that necessitate piecemeal litigation "result in inefficiency." *Capital Tech. Info. Servs., Inc. v. Arias & Arias Consultores,* 270 S.W.3d 741, 752 (Tex. App.-Dallas 2008, pet. denied). We have already held that Waterman, an Alabama corporation with its principal place of business also in Alabama, lacks the sufficient contacts necessary for Texas to exercise personal jurisdiction. Maersk contends that Virginia is the most appropriate forum to litigate this dispute. There is no evidence that Waterman has sufficient contacts for Virginia to exercise jurisdiction, there is no evidence that Maersk has sufficient contacts for Alabama to exercise jurisdiction, and there is no evidence that either Waterman or Maersk has sufficient contacts for the other states whose residents are involved—New York, Florida, and Pennsylvania—to exercise jurisdiction. There is no evidence that any particular state can exercise personal jurisdiction over both defendants. Piecemeal litigation, therefore, may be unavoidable in this case.

When we consider all of the factors, we conclude that Maersk has failed to present a compelling case that the exercise of personal jurisdiction over it in Texas would violate traditional notions of fair play and substantial justice. We therefore hold that the trial court correctly denied Maersk's special appearance.

### Failure to File Findings of Fact and Conclusions of Law

Finally, in their fifth issue, Waterman and Maersk contend that the trial court erred in failing to file findings of fact and conclusions of law after they timely requested such findings and conclusions.

A trial court may, but is not required to, file findings of fact and conclusions of law after it enters an interlocutory order such as an order denying a special appearance. Tex.R.App. P. 28.1(c); *Blair Commc'ns, Inc. v. SES Survey Equip. Servs., Inc.,* 80 S.W.3d 723, 725 (Tex.App.-Houston [1st Dist.] 2002, no pet.). Texas Rules of Civil Procedure 296 and 297 generally govern the filing of findings of fact and conclusions of law. *See* Tex.R. Civ. P. 296 ("In any case tried in the district or county court without a jury, any party may request the court to state in writing its findings of fact and conclusions of law."); *id.* 297. Rule 296 gives "a party a right to findings of fact and conclusions of law finally adjudicated *after a conventional trial on the merit s* before the court." *IKB Indus. (Nigeria) Ltd. v. Pro-Line Corp.,* 938 S.W.2d 440, 442 (Tex.1997) (emphasis added). In other cases, findings and conclusions are "proper, but a party is not entitled to them." *Id.* Because Rules 296 and 297 do not "impose any duty on the trial court" to file findings and conclusions when no trial takes place, such as in the case of special appearances subject to interlocutory appeal, appellants demonstrate no "intrinsic error" by the trial court's failure to file findings and conclusions. *In re Estate of Davis,* 216 S.W.3d 537, 542 (Tex.App.-Texarkana 2007, pet. denied) (quoting *Niehaus v. Cedar Bridge, Inc.,* 208 S.W.3d 575, 579 n. 5 (Tex.App.-Austin 2006, no pet.)).

Here, after the trial court denied the special appearances, Waterman and Maersk requested findings of fact and conclusions of law pursuant to Rules 296 and 297. Because this is a special appearance and there has not yet been a conventional trial on the merits, Waterman and Maersk are not entitled to findings and conclusions.[18] We therefore hold that the trial court did not err in failing to file findings and conclusions.

### Conclusion

We affirm the portion of the trial court's order finding that it has personal jurisdiction over Maersk. We hold that Waterman lacks sufficient minimum contacts to support general jurisdiction. We therefore reverse the portion of the trial court's order finding that it has personal jurisdiction over Waterman and render judgment dismissing Waterman from the litigation.

---

18. Furthermore, it is undisputed that Waterman and Maersk did not file a notice of past due findings and conclusions before they filed their notices of appeal in this Court. The failure to file a notice of past due findings and conclusions waives the right to complain about the trial court's failure to file findings and conclusions on appeal. *I & JC Corp. v. Helen of Troy L.P.,* 164 S.W.3d 877, 885 (Tex. App.-El Paso 2005, pet. denied).